State of Iowa, Appellant, v. Amana Society.

**Religious societies:** ACQUISITION AND USE OF PROPERTY: CORPORATE
1 POWER. A religious society organized under Chapter 2, Title 9 of the Code, seeking to effectuate its ideals of religious life through the common ownership and management of the property of its members, may so acquire and hold real property and establish and conduct various industries, and so long as its enterprises are extended and conducted simply to meet the needs of its members and maintain them in a manner consistant with their religious faith, to which its total income and accumulation of property is devoted, will not be dissolved and its privileges forfeited on the ground that it has exceeded its corporate power.

**Same:** PUBLIC POLICY. The organization and maintenance of a
2 communistic society is not contrary to public policy, though

not in accord with prevailing American Ideals, where its teaching, acquisition and use of its property is not injurious to others.

*Appeal from Iowa District Court.*— HON. O. A. BYINGTON, Judge.

TUESDAY, NOVEMBER 20, 1906.

ON application of Martha Wilson, the county attorney of Iowa county was ordered to prosecute the Amana Society " for the wrongful exercise of corporate powers," under chapter 9 of title 21 of the Code. Thereupon the county attorney, W. E. Wallace, filed a petition in the name of the State, alleging in substance that the society had been incorporated as a religious organization, and that, in violation of its charter rights, it had engaged extensively in agricultural pursuits and in business and manufacturing enterprises for financial gain, and thereby had exceeded its corporate powers and exercised those peculiar to corporations organized for pecuniary profit, and, on this ground, prayed for the dissolution of the corporation and the forfeiture of its privileges as such. The answer specifically enumerates the various enterprises of the society and the property it owns, but denies that any of it is made use of for other than religious purposes. Trial to the court resulted in the dismissal of the petition. The State appeals.— *Affirmed.*

*Chas. W. Mullan,* Attorney General, and *Lawrence De Graff,* Assistant Attorney General (*W. E. Wallace* and *S. H. Fairall,* of counsel), for the State.

*M. J. Wade,* for appellee.

LADD, J.— Corporations in this State are organized under general laws, and are separated by the Code into two classes — those for pecuniary profit and those not for pe-

cuniary profit.    In this action, in the nature of proceedings
in *quo warranto,* the contention of the State
is that the defendant, though organized under
the statutes relating to corporations not for
pecuniary profit, is exercising the functions of a corporation
for pecuniary profit, in that it is possessed of extensive
property interests with which, in connection with divers busi-
ness enterprises, the society is engaged in money making, and
that, for this reason, the corporation should be dissolved and
its franchise forfeited.    The defendant does not deny hav-
ing property as alleged, nor that such property is so employed
as to yield a fair return, but insists that the purpose is not
pecuniary profit in the sense contemplated by statute.

The society was first incorporated in 1859 under chapter
131 of the Acts of the Seventh General Assembly, amenda-
tory to chapter 44 of the Code of 1851, reincorporated in
1880 under the provisions of chapter 2 of title 9 of the Code
of 1873, and again in 1900 under chapter 2 of title 9 of the
Code.    Section 1642 of this title provides that " any three
or more persons of full age, a majority of whom shall be
citizens of the State, may incorporate themselves for the
establishment of churches, colleges, seminaries, lyceums, li-
braries, fraternal lodges or societies, temperance societies,
trades' unions or other labor organizations, agricultural so-
cieties, farmers' granges, or organizations of a benevolent,
charitable, scientific, political, athletic, military or religious
character, by signing, acknowledging, and filing for record
with the county recorder of the county where the principal
place of business is to be located, articles of incorporation,
stating the name by which the corporation or association
shall be known, which shall not be the same as that of
any such organization previously existing, its business or
objects, the number of trustees, directors, managers or other
officers to conduct the same, and the names thereof for the
first year."    Section 1643 of the Code:    " Upon filing such
articles, the persons signing and acknowledging the same,

*1. RELIGIOUS SOCIETIES: acquisition and use of property: corporate power.*

and their associates and successors, shall become a body corporate, with the name therein stated, and may sue and be sued.   It may have a corporate seal, alterable at its pleasure, and may take by gift, purchase, devise or bequest real and personal property for purposes appropriate to its creation, and may make by-laws.   Corporations so organized shall endure for fifty years, unless a shorter period is fixed in the articles, or they are sooner dissolved by three-fourths vote of all the members thereof, or by act of the General Assembly, or by operation of law."   Section 1645 of the Code:   " No dividend nor distribution of property among the stockholders shall be made until the dissolution of the corporation."  · Section 1647 relates to the selection of trustees, directors, or managers of the corporation.

It will be observed that, under the first section quoted, it is enough if the organization be of a religious character, that under the next section it may acquire " real and personal property for purposes appropriate to its creation," and by the third section, distribution of the property, by dividend or otherwise, prior to dissolution is not allowed. But the manipulation of property which may be acquired by corporations of this class so that it shall yield a profit and the use of such profit to promote its objects is not prohibited. Indeed, the right to the income from the beneficial employment of property is one of the incidents of ownership.   Thus colleges are maintained in large part from the income derived from the investment of endowment funds; and the benevolences of charity are continued indefinitely from the returns of property dedicated to its use.   The distinction between corporations organized under this chapter and those for pecuniary profit has relation, not to whether the one or the other shall earn or receive an income, though this may be important as evidence, but to the design had in organizing and the objects sought to be attained; not to methods pursued so much as the things to be accomplished.   If the purpose is to earn money or property, if financial gain is the main

or controlling object for which the corporation is created then, regardless of other circumstances, it is within the class designated as corporations for pecuniary profit. See *Santa Clara Female Academy v. Sullivan,* 116 Ill. 375 (6 N. E. 183, 56 Am. Rep. 776). But if organized for one of the purposes enumerated in the statute quoted, as for the promotion of the doctrines of some sect in religion or for education or some charity, and the property acquired and the income therefrom is essential to effectuate such purpose, and is so employed then these are incidental to the main object of the organization and the corporation cannot be said to exist for pecuniary profit.

The Legislature, while expressly allowing such corporations (not for pecuniary profit) to acquire and hence to hold property, has limited this to an amount appropriate for the purposes of their creation. To be thus appropriate it is not enough that the property sustain a slight or remote connection with the purposes contemplated. The mere fact that money may be necessary to meet expenses will not authorize the corporation to engage in some independent business enterprise to earn it. Thus a corporation organized to teach the gospel according to the doctrines of the Methodist Episcopal Church may not engage in the construction of a business block on credit. *First M. E. Church v. Dixon,* 178 Ill. 260 (52 N. E. 887). Obviously the power to acquire and make use of property was intended to be incidental to and in aid of the power conferred to accomplish certain purposes through the organization of a corporation, and, like incidental or implied powers generally, must be directly and immediately appropriated to the execution of the purposes designed. This does not mean that the property or enterprise shall be indispensable. If reasonably necessary and convenient to carry into effect the purposes of the corporation, it is within the rule of the statute, and, indeed, that with respect to incidental or implied powers of

corporations generally as appears from the numerous authorities cited by both parties.

Nor does it mean, as the Attorney General seems to contend, that in no event may such a corporation engage in secular work. If so, the vast accumulations held for the endowment of institutions of learning and sustenation of charity must remain unproductive, for to invest in stocks or bonds or in property producing an income would be to engage in a secular occupation foreign to the purposes of its creation; and the use would be limited to the consumption of the funds until exhausted. Such is not, and ought not to be, the law. Institutions are supported with money, and money is the product of labor, and labor is more or less tinged with a secular character. In construing a clause of the Constitution of Illinois declaring exempt from taxation such property as might be deemed necessary for school purposes Mr. Justice Miller said: " We think the distinction very broad between property contributing to the purposes of a school, made to aid in the education of persons in that school, and that which is directly and immediately subjected to use in the school. The purposes of a school and the school itself are not identical. The purpose of a college or university is to give youth an education. The money which comes from the sale or rent of land dedicated to that object aids this purpose and lands so held or leased are held for school purposes, in the fullest and clearest sense." *Northwestern University v. People,* 99 U. S. 309 (25 L. Ed. 387). And in *Book Agents of M. E. Church v. Hinton,* 92 Tenn. 188 (21 S. W. 321, 19 L. R. A. 289), the purpose of a book concern was the dissemination of religious knowledge by the publication of books and periodicals, and from the profits derived therefrom to support superannuated and worn-out ministers, their wives, widows, and children. Though it did a business of over $336,800 per annum, $6,000 of which was received from outside or secular work, it was held to be both a religious and charitable corporation, and its prop-

erty declared exempt from taxation under a provision of the Constitution of Tennessee exempting therefrom all property used exclusively for the purposes of religious, charitable, scientific, literary, or educational institutions. · We think the statute furnishes a satisfactory test. The property must be appropriate for the purposes for which the corporation is created, and whether thus appropriate necessarily depends on the nature of the property and the use to which it is devoted, as well as the particular purposes it is expected to subserve.

The defendant is an organization of a religious character. The charitable and benevolent objects included are such only as are enjoined as duties in the exercise of that Christian faith for the promotion of which the corporation was created. The preamble to the Constitution, which is the foundation of all the articles of incorporation, recites the emigration of the "community of True Inspiration" from Germany to this country in 1843 " for the sake of civil and religious liberty," its settlement at Ebenezer, near Buffalo, N. Y., and removal therefrom to Iowa county " according to the known will of God." The purposes of incorporating may be gathered from this constitution.

The first article, after acknowledging the foundation to be God and " the faith which He worketh in us according to His free grace and mercy," declares that: " The purpose of our association as a religious society is therefore no worldly or selfish one, but the purpose of the love of God in His vocation of grace received by us, to serve Him in the inward and outward bond of union, according to His laws and His requirements in our own consciences, and thus to work out the salvation of our souls, through the redeeming grace of Jesus Christ, in self-denial, in the obedience of our faith and in the demonstration of our faithfulness in the inward and outward service of the .community by the power of grace, which God presents us with. And to fulfill this duty we do hereby covenant and promise collectively and each to the

other by the acceptance and signing this present constitution.

"Article 2. In this bond of union tied by God among ourselves, it is our unanimous will and resolution that the land purchased here, and that may hereafter be purchased, shall be and remain a common estate and property, with all improvements thereupon and all appurtenances. thereto, as also with all the labors, cares, troubles, and burdens, of which each member shall bear his allotted share with a willing heart."

The third declares that " agriculture and raising of cattle and other domestic animals, in connection with some manufacturing and trades, shall, under the blessing of God, form the means of sustenance of this society. Out of the income of the land and other branches of industry the common expenses of the society shall be defrayed. The surplus, if any, shall from time to time be applied to the improvement of the common estate of the society, to the building and maintaining of meeting and school houses, printing establishments, to the support and care of the old, sick, and infirm members of the society, to the founding of a business and safety fund, and to benevolent purposes in general."

Article 4 relates to the management of the society's affairs, and article 5 requires every one, upon becoming a member, to surrender all his property to the trustees, for which a receipt is given.

"Article 6. Every member of this Society, is, besides the free board and dwelling, and the support and care secured to him in his old age, sickness, and infirmity, further entitled out of the common fund to an annual sum of maintenance for himself or herself, children and relations in the Society, and these annual allowances shall be fixed by the trustees for each member single or in families, according to justice and equity, and shall be from time to time revised and fixed anew. And we the undersigned members of this corporation in consideration of the enjoyment of these blessings in the bond of our Communion, do hereby release, grant,

and quitclaim to the said corporation, for ourselves, our chil-
dren, heirs and administrators, all claims for wages and in-
terest of the capital paid in to the common fund, also all
claims of any part of the income and profits, and of any share
in the estate and property of the Society separate from the
whole and common stock."

Article 7 provides for the care of orphans, and article
8 for the repayment of the amount received, to any member
receding from the society.

The new articles of incorporation in substance are repe-
tition of the constitution, and in the last the business and
object of the society is declared to be: " First. To promote
the spiritual and temporal welfare and happiness of its mem-
bers and to enhance and advance them in religious teachings,
worship and practices and. to elevate them to a higher and
better state in Christian life and duty and as is set forth and
designated in the constitution and by-laws of said society,
and to carry out the plan and objects disclosed in the consti-
tution."

It is manifest from these extracts from the articles and
constitution that the corporation was organized to aid in
effectuating certain ideals in religious life, especially those
relating to communistic ownership of property; and the State
insists that such ownership and the management of the prop-
erty for the maintenance of the community cannot be other
than purely secular and is inappropriate to religious pur-
poses.   Possibly a majority of Christians have concluded
that community ownership of property apparently ordained
by the Apostles was merely temporary but this opinion has
not been shared by all.   The Moravians, Shakers, the
Oneida Community, and more recently the Zionists, have
thought otherwise.   No one will claim that the doctrine is
entirely without support in the Scriptures.   Those who be-
came believers on the day of Pentecost, we are told, not
only continued " steadfastly in the Apostles' doctrine," but
" were together, and had all things in common, . . .

sold their possessions and goods, and parted them to all men, as every man had need. . . . Neither said any of them that aught of the things which he possessed was his own; but they had all things in common. . . . Neither was there any among them that lacked; for as many of them as were possessors of lands or houses sold them, and brought the prices of the things that were sold, and laid them down at the Apostles' feet; and the distribution was made unto every man according as he had need." Why was this done? Merely as a temporary expedient, or shall the awful fate of Ananias and Sapphira for concealing a part of the price of their property be accepted as proof that communal life was enjoined as one of the doctrines of the Christian faith? It is not within the province of any department of the government to settle differences in creeds, and the courts ought not to arrogate to themselves the power to restrain or control the free exercise of any, so long as this shall be harmless. It is not for them to determine what ought or ought not to be an essential element of religious faith. The law will not undertake to discriminate between religions or creeds, nor will it assume to say that any point of doctrine is unreasonable, or should be eliminated, or that it is unsuitable to the times, save as may be necessary in the consideration of temporal consequences. No matter how absurd the doctrine may appear to others, those who accept it are entitled to the protection of the law. In this country the conscience is not subject to any human law and the right to its free exercise, so long as this is not inimicable to the peace and good order of society, is guarantied by the Constitution.

The members of the defendant society regard the mode of life described in the Acts of the Apostles as an essential part of their religion. Their notion is that people are placed in this world for the one purpose of saving their souls, and that this requires the crucifixion of such desires and appetites as divert attention from God. Their aim is to live such a life as Christ lived. To attain this they believe it

necessary that everything be held in common; that each individual be relieved from the cares and burdens of separate property ownership, to the end that selfishness may be eradicated; and that all may enjoy the better opportunity of knowing and serving God. This is an essential element of their religious faith, and this, when innocent of injurious consequences, is, as we think, the test to be applied in determining whether such enterprises as those carried on by the Amana Society may be prosecuted by a corporation not organized for pecuniary profit.

The Attorney General, in support of his argument that the ownership and management of the property is not for a religious purpose, quotes numerous definitions of religion by eminent scholars and divines, and then eloquently summarizes them by saying: " Religion pertains to the spiritual belief and welfare of man, as distinguished from his physical wants and necessities. It relates to the ethics of life and to the hope and belief in immortality. Secular business and pursuits, upon the other hand, are those pertaining to the material and physical wants of man, and are clearly distinguished from things spiritual or holy. They relate to temporal as distinguished from eternal interests; not immediately or primarily respecting the soul, but the body." Theoretically the distinctions pointed out may be correct. Practically religion may not be so completely separated from the affairs of this life. Theology, the science of religion — that is, of formulating our thinking with respect to religion — has steadily insisted upon connecting religion with the life men lead and the things they do in this world. The great religious struggles of the past have come in most cases from the undertaking of men to impose on other men, not their religion, but their science of religion; and against this, rather than religion, as defined by the Attorney General, the law has interposed its shield of protection. When theologians formulate their conclusion that anything such as a particular mode of life is essential to the attainment of

the promised benefits of a religion, it is not for the courts by resorting to the definitions of lexicographers to perform the ungracious, if not herculean, task of determining whether this is so. The anticipated advantages of nearly every religion or creed are made dependent on the life its followers live, and the criticisms most often heard are that the exalted doctrines of righteousness professed are too frequently forgotten in the ordinary pursuits of life, and that the contests for wealth are waged with the rapacity of beasts of prey. Surely a scheme of life designed to obviate such results, and by removing temptations, and all the allurments of ambition and avarice, to nurture the virtues of unselfishness, patience, love, and service, ought not to be denounced as not pertaining to religion when its devotees regard it as an essential tenet of their religious faith.

In ascertaining whether various properties of the society are for religious purposes, these should be viewed somewhat from the standpoint of its members. From that viewpoint its different enterprises are clearly within the rule stated by the Attorney General, that this must " be convenient and appropriate to religious work and ceremonies and to the worship of God according to their belief "; for it is indispensable to their religious faith that they own their property in common and live a communal life. As a religious principal they have agreed to this and to devote their common labor to their common support. None can be said to derive any pecuniary benefit therefrom in the sense in which that expression is used in the statute. No dividends are declared, and no money is given to any member, save to meet the bare necessities of the most economical existence. Neither the trustees nor any of the members derive any personal profit from what they do beyond the necessities of existence. Upon becoming a member every one surrenders all his property to the society, and thereupon stands upon an equal footing with those who have become members without property to surrender. The poor enjoy precisely the same

privileges as those who were once rich.   No compensation is
made for work; those exercising control and assuming great
responsibilities sharing equally with the humblest person in
the community.   Of necessity, real estate has been acquired
and different industrial enterprises undertaken.   Only in
this way could the members be provided with homes, sup-
port, and the opportunity to follow their customary avoca-
tions.  The society now consists of about one thousand, seven
hundred and fifty people, and it owns twenty-six thousand,
two hundred and twenty-five and six-tenth acres of land in
Iowa and Johnson counties of the estimated value of $40
per acre, nearly half of which is either cultivated or used
for meadow or pasture, and the remainder unsubdued brush,
timber, or swamp land.   On this land are situated seven vil-
lages containing two hundred and eighty dwelling houses in
which the members of the community live, two woolen and
one cotton factory, including eleven buildings connected
therewith, seven sawmills, four hotels, seven general stores,
three drug stores, seven blacksmith shops, three lumber yards,
and fifty-one barns.   Horses, cattle, hogs, and sheep of the
estimated value of $70,466 are kept.   The products of agri-
culture averaged during the three years preceding 1906 about
$80,000 annually, while the output of the mills was $325,-
964; the average sales from the stores was $136,858; from
the lumber yards $25,081.   Live stock was bought and sold
amounting in value to $123,322, and other farm products to
that of $41,839.   Two hundred persons, not members of the
society, were employed at an expense of $26,000 per annum.
And yet all the income was necessary and made use of for
the support of these people.   But it has not been the purpose
of the society to expand its business in any line, nor to pro-
cure a greater income than necessary to meet the needs of
the community and maintain all the members in a manner
consistent with the tenets of their religious faith.   Every in-
dustry is essential to this result.   If tracts of land have been
sold and others purchased, this has been done, not for the

purposes of speculation, but to better meet the needs of the society. Aside from some improvements essential to the economic use of the property and the incidental increase in the value of land, there has been little or no accumulation in the way of property, change in methods or progress for many years. The members have held steadily to the original design of the founders, seeking not the riches of this world, but of living according to the models of those early Christian societies which existed in the days of the Apostles.

Lastly, it is argued that the organization and maintenance of such a society is obnoxious to sound public policy. Certain it is that the status of the individual members is not in accordance with prevailing American ideals. Community life is thought by many to be inconsistent with the development of individuality, and to be destructive of the incentives to individual growth and higher living. But in this country all opinions are tolerated and entire freedom of action allowed, unless this interferes in some way with the rights of others. Each individual must determine for himself what limit he shall place upon his aspirations, and, if he chooses to smother his ambitions, the public has no right to interfere. Nor can the acquiring of considerable property be objectionable, if managed so as not to be injurious to State. No claim is made that a monopoly has been created, nor would the evidence support such a claim if made. But it is argued that as the society has acquired all the land in a township, and therefore may exercise control over one political division, it may extend this to others and finally gain control over the affairs of the entire State. Counsel concede that this is improbable, but argue it as a logical sequence. The history of the Mormon Church may furnish some evidence that the future in such matters cannot be foretold. The fate of other similar enterprises during the past century, such as the Brook Farm, the Phalanxes, and other experiments of the followers of Fourier, Owens, and others, and those described in the de-

cisions below, indicate that the peril is not at all imminent. So long as selfishness is the controlling passion of the human heart, the individual in all probability will be safe as against the encroachments of communism. At any rate, it will be time enough to obviate the danger when if ever it is seriously threatened with appropriate legislation. Had these people formed themselves into a voluntary association, unincorporated, and, as such, acquired the property involved in this case and operated the various enterprises, there could have been no objection. Neither the common law nor any statute of this State prohibited such a course. Such an association and its trusteeship of property for its members in common has been held in numerous decisions to be in harmony with public policy. *Schriber v. Rapp,* 5 Watts (Pa.) 351 (30 Am. Dec. 327); *Gass v. Wilhite,* 2 Dana (Ky.) 170 (26 Am. Dec. 446); *Waite v. Merrill,* 4 Greenl. (Me.) 102 (16 Am. Dec. 238); *Goesele v. Bimeler,* 14 How. (U. S.) 590 (14 L. Ed. 554); *Schwartz v. Duss,* 187 U. S. 8 (23 Sup. Ct. 4, 47 L. Ed. 53); *Ellis v. Newbrough,* 6 N. M. 181 (27 Pac. 490). See *Burt v. Oneida Community,* 137 N. Y. 346 (33 N. E. 307, 19 L. R. A. 297). On no tenable ground can doing precisely the same things through a corporation be held opposed to public policy. On these considerations we reach the conclusion that the defendant society has not exceeded its powers as a religious corporation. Secular pursuits, such as those conducted by it, are not ordinarily to be regarded as incidental to the powers of a religious corporation for the very good reason that ordinarily they bear no necessary relation to the creed it is organized to promote. But, where the ownership of property and the management of business enterprises in connection therewith are in pursuance of and in conformity with an essential article of religious faith, these cannot be held, in the absence of any evidence of injurious results, to be in excess of the powers conferred by the law upon corporations. We have discovered no decision touching the question decided; but, in view

of the spirit of tolerance and liberality which has pervaded our institutions from the earliest times, we have not hesitated in giving the statute an interpretation such as is warranted by its language and which shall avoid the persecution of any and protect all in the free exercise of religious faith, regardless of what that faith may be. Under the blessings of free government, every citizen should be permitted to pursue that mode of life which is dictated by his own conscience, and if this, also, be exacted by an essential dogma or doctrine of his religion, a corporation organized to enable him to meet the requirement of his faith is a religious corporation and as such may own property and carry on enterprises appropriate to the object of its creation.

This is the conclusion reached by the district court, and its judgment is *affirmed*.