STATE OF IOWA, Appellee, v. AUGUST BARTELS, Appellant.

**SCHOOLS AND SCHOOL DISTRICTS:** Teachers—Instruction in German. The teaching of "reading" in a parochial school to pupils under the eighth grade by means of books on secular subjects in the German language is violative of Ch. 198, Acts 38th G. A., even though the purpose of such teaching is to qualify such children, in accordance with the beliefs of the church, (1) to read and understand the German catechism and Bible, in order to become communicants of the church, and (2) to participate intelligently in the home with their parents in religious worship and instruction in the German language, and even though all common school branches, *including reading,* are also taught in English in said school.

EVANS, C. J., WEAVER and PRESTON, JJ., dissent, holding that, under the stipulated record, the teaching in question was for a religious purpose—was not secular.

**CONSTITUTIONAL LAW:** Prohibition of Foreign Language Instruction. The prohibition against the teaching in other than the English language of secular subjects in public and private schools in named grades is not subject to the vice (1) of violating inalienable rights, (2) of prohibiting the free exercise of religion, (3) of constituting class legislation, or (4) of abridging the privileges or immunities of citizens of the United States.

EVANS, C. J., WEAVER and PRESTON, JJ., dissent as to Clause 2, holding that, under the particular record of this case, the instruction in question was nonsecular.

*Appeal from Bremer District Court.*—M. F. EDWARDS, Judge.

FEBRUARY 12, 1921.

REHEARING DENIED JUNE 25, 1921.

THE defendant was convicted of a violation of Chapter 198 of the Acts of the Thirty-eighth General Assembly, which prohibits the use of any language other than English, in teaching secular subjects in the public or private schools of this state. From such conviction and sentence thereon, this appeal is prosecuted. The opinion states the facts.—*Affirmed.*

*Pickett, Swisher & Farwell* and *F. P. Hagemann,* for appellant.

*H. M. Havner,* Attorney General, *F. C. Davidson,* Assistant Attorney General, and *W. H. Wehrmacher,* County Attorney, for appellee.

FAVILLE, J.—An information filed with a justice of the peace charged that the defendant, on or about November 10, 1919, "did use a language other than English, to wit, the German language, as a medium of instruction in the teaching of a secular subject, to wit, reading, to Selma Steege, Cordelia Griese, and Lawrence Phipo, the said persons then and there being scholars in a private school in the aforesaid township, county and state, and receiving said instruction below the eighth grade in said school from said defendant, who was then and there a teacher in said school." He was found guilty, and, on appeal to the district court, the case was submitted on stipulation of facts, from which it appeared that:

1. SCHOOLS AND SCHOOL DISTRICTS: teachers: instruction in German.

(1) "A rural church known as 'St. Johns Evangelical Lutheran Church,' located in Maxfield Township, Bremer County, owns and uses a church edifice and parochial school building, and other property in connection therewith, of the value of approximately $40,000, and, during the period in question, had a congregation of about 300, of whom 200 were communicants; that it is a religious organization, affiliated with the Evangelical Lutheran Synod of Iowa and other states; and that the said church and its parochial school have been continuously supported and maintained by the members for religious purposes, in accordance with the beliefs and practices of the said Evangelical Lutheran Synod of Iowa and other states; that among

the beliefs and practices of the said church and the synod with which is it affiliated is the belief and practice of having the children of the members and communicants attend its parochial school until after their confirmation and acceptance into the church as communicants thereof; and that the object and purpose of the parochial school is to give the said children of the members and communicants a Christian education in the catechism, beliefs and practices of the said church at the same time that they are receiving their secular education in the common branches, and to conduct daily in said school devotional exercises, in accordance with said beliefs and practices.

(2) ''Those attending said school are children of the members of the church, approximately 36 pupils in number of the ages between 6 and 13 years, both inclusive; that the said school is in session 36 weeks, of 5 days each, with school hours from 9 o'clock A. M. to 12 o'clock noon, and from 1 o'clock P. M. to 4 o'clock P. M., each school day, beginning about the middle of September and ending about the middle of the following June, with the ordinary holiday vacations; that ordinarily the children of the school are confirmed and received into the church on attaining the age of 13 years, at which time the said pupils are expected to, and as a rule have, completed the seventh grade in the common school branches, and usually thereafter attend the public schools in the community, entering the eighth grade thereof. The school year of the parochial school is a month or more longer than that of the public schools in the same community. The branches taught are the common school branches of reading, writing, spelling, arithmetic, geography, American citizenship, physiology, and United States history, and these are taught in the English language, with English as the medium of the instruction, the textbooks being the same as those used in the public schools in the same community, and the instruction being substantially the same as the instruction given in the common branches of the public schools in the community.''

(3) The defendant, Bartels, is ''the duly appointed, employed, and acting teacher of said parochial school continuously during the last 5 years; that said defendant is a competent teacher, possessing the necessary qualifications and moral character for that purpose.''

(4)   The members of the said church whose children attend this school are of foreign extraction, but they, as well as their children and this defendant, are citizens of this country.

(5)   ''The members and communicants of said church have always been accustomed to worship in the church and have devotional exercises in the home in the German language, and that the devotional exercises and religious instruction of the children in said parochial school for many years was exclusively in German. During recent years, religious instruction in the said parochial school has been and is now given in both the English and German languages. This instruction has been given in this way in order that the children might be able to participate intelligently with their parents in religious worship in the home and in the church. It is done for the purpose of enabling the parents to supplement the religious instruction of the school by instruction in religion and morals in the home. It is the desire of the parents of the children who are in attendance at said school that their children be given instruction in religious matters in the German language, to enable them to read intelligently the church catchism and the Bible in the German.''

(6)   Part of the communicants and members ''have insufficient knowledge of the English language to freely and clearly receive or impart instruction in the matter of religion and morals, or to take part with the same freedom and the same understanding in religious or devotional exercises conducted in the English language that they would in the German; that, among the duties enjoined by said church, and which are the beliefs and practices of the communicants of said church whose children are now attending the aforesaid parochial school, are the duties of assembling with the members of their families and attending at stated periods devotional services conducted in the home, and of attending with their children religious services conducted in said church, consisting of sermons, instructions in matters of faith and religion, and singing of hymns and other religious and devotional exercises usual in Protestant Christian churches. That knowledge of the catechism is essential to confirmation in the church, and that is the belief of the members and communicants of said church whose children are now attending the aforesaid parochial school; that the training of

their children in religion and Christian citizenship will be materally and irreparably interfered with unless the said children learn to read the language used by the parents in worship in the church and the home. That it is the belief of the said church and the members and communicants thereof that children should be prepared for confirmation at about the time they complete the seventh grade in the secular branches, or when they have attained the age of 13 years. It is also the belief of the members and communicants of the said church that parents will not be able to perform their full Christian duty toward their children in accordance with the beliefs and practices of the church if they are unable to supplement the religious training of their children through admonitions and worship at the home, conducted by the parents in the German language, in which they are accustomed to worship.''

(7) The defendant, through the medium of the English language, taught the common school branches heretofore mentioned, and also taught reading in the German language to the pupils named in the indictment and others, who were of ages ''between six and thirteen years inclusive, and were below the eighth grade. The textbooks used in teaching reading in the German language to said pupils were printed in the German language, and contained such reading lessons as ordinarily appear in elementary reading textbooks printed in the English language and used in the public schools of the state, and are hereby admitted to be of a secular character, rather than of a religious character.''

German was used as the medium of instruction by defendant in teaching reading in the German language. This German reading was taught at the request and with the full consent of the parents of the said children, and for the purposes of teaching said children to read the German language sufficiently to enable them intelligently to read the catechism and Bible in that language, and to understand and to take part in religious services conducted in said language in the church and Sunday school and in the home.

The facts so stipulated were held to establish defendant's guilt, and he was sentenced to pay a fine of $25. He appeals.

From the foregoing it will be observed that the accused

taught in a parochial school connected with St. Johns Evangelical Lutheran Church, in Bremer County, and had so done from the middle of September to November 10, 1919. The instruction was in branches below the eighth grade. He employed English as a medium of instruction in all the common school branches, but taught the pupils to *read* in the German language, and used German in so doing. The textbook used was printed in the German language, and contained reading lessons such as ordinarily appear in the English reading textbooks in the public schools, and was admitted to be of a secular character, rather than a religious character. Such are the facts, and it is plain enough therefrom that the accused (1) employed the German language as a medium of instruction in a secular subject, i. e., reading, and (2) taught the German language to pupils below the eighth grade, in violation of Section 1 of Chapter 198 of the Acts of the Thirty-eighth General Assembly, which provides:

"The medium of instruction in all secular subjects taught in all of the schools, public and private, within the state of Iowa, shall be the English language, and the use of any language other than English in secular subjects in said schools is hereby prohibited; provided, however, that nothing herein shall prohibit the teaching and studying of foreign languages as such as a part of the regular school course * * * above the eighth grade."

The second section of the act provides for a penalty against any person violating any of the provisions thereof. It cannot well be contended that the accused did not, in what he did, bring himself clearly within the letter of the prohibition of this act, and we do not understand his counsel to contend otherwise. Appellant's theory seems to be that the acts complained of were not intended by the lawmakers to be prohibited; and that, if so intended, the statute is inimical to certain provisions of the Constitution. This contention is based largely on the fact that the school in question is maintained by the members of the church, and it is contended that, in accordance with the object of giving their children an education in the catechism, beliefs, and practices of the church at the same time they are receiving their education in the common branches, it is desirable that they be taught to read in German. Ordinarily, their religious education is so advanced, when they attain the thirteenth year,

that they are taken into the church; and as, ordinarily, they have then completed the seventh grade in the common branches, they enter the eighth grade of the public school in the same community. The members of the church are of foreign extraction, but are, as well as their children, citizens of this country. They are accustomed to worship at church, as well as at home, in the German language. Formerly, the religious instruction was given in the parochial school exclusively in German, but in recent years, in English as well. The purpose of instruction in German was to enable the parents to supplement the religious instruction of the school by instruction in religion and morals in the home. These parents desire their children to acquire sufficient knowledge of the German language to enable them to read intelligently the church catechism and the Bible in German. A considerable number of the members of the church cannot speak or read in English, and these participate in worship with their children and impart instruction in German. It is the belief of members and communicants of the church that parents will not be able to perform their full Christian duty toward their children in accordance with the beliefs and practices of the church if they are unable to support the religious training of their children through admonition and worship at the home, conducted by the parents in the German language, in which they are accustomed to worship.

It is to be observed that neither the statute quoted nor any other of this state restricts the right of parents, at home or through instructors in private or parochial schools, to worship according to their faith and religious belief in whatever language they choose, unless it may be said that such is the effect of this statute, limiting the use of languages other than English in imparting instruction and prohibiting the teaching thereof below the eighth grade. It is not pretended that religious instruction at home, in the church, or in the school has been interfered with, save as the right to teach the German language, especially in reading, is impinged upon by denial of the right to instruct pupils therein, and thereby qualify the children to participate in worship with their parents and receive instruction from them.

It is helpful, in construing or interpreting statutes, to as-

certain the general policy of the state regarding the subject. Surely, no one will gainsay that the state has a right, under its general police power, to enact reasonable and proper statutes respecting the education of its youth. Such power and right have been too long recognized to now be questioned, or to require citation of authority to support their legitimate exercise.

It is undoubtedly true that the state cannot pass arbitrary laws excluding foreigners from its borders. The power to regulate and restrict immigration rests in the Federal government alone. But the state does have the power to control its own internal affairs and to prescribe such laws as are proper for the government of its citizenry, provided such laws do not contravene the provisions of the Constitution of the United States or of the state.

It is true that the Federal government has the exclusive control of the gates of Castle Garden and can determine who may enter through them; but, when a foreigner has passed through those portals and has become a resident of the state of Iowa, he becomes at once amenable to the laws of this state, in so far as they do not transcend those constitutional rights vouchsafed to all citizens. The state has an absolute right to adopt a policy of its own, respecting the health, social welfare, and education of its citizens; and, so long as it does no violation to constitutional inhibitions, the citizen within its borders has no other alternative than to obey, or remove to a more congenial environment. Iowa has not been backward in enacting legislation, under these well-recognized powers. Our public health statutes, providing for compulsory quarantine and similar regulations, have been upheld and enforced. A citizen may feel that he has a perfect right to determine for himself whether his child under 16 years of age shall be employed, and the hours and conditions of such service; but if so, he must acquire residence in some state which has no child labor law similar to ours. So, too, with many other statutes which have been enacted by our general assembly, and are the settled policy of this state. To all such, the person, native born or foreigner, who seeks residence within this commonwealth must subscribe. From the earliest days, the settled policy of this state has been to foster, encourage, and promote the education of its youth. Our great

public school system and our state institutions of higher education are the outcome and result of this policy. No one will dispute the power and the right of the state to adopt and carry out such a beneficent policy. Our question in the instant case concerns the limitations that shall be placed upon the exercise of the power of the state in the fulfillment of that policy. We have a right to consider the policy of the state, the conditions sought to be remedied, and the remedy proposed.

For many years we have had a statute in this state known as the "Compulsory Education Law." It provides that:

"Any person having control of any child of the age of 7 to 16 years inclusive, in proper physical and mental condition to attend school, shall cause such child to attend some public, private, or parochial school, where the common school branches of reading, writing, spelling, arithmetic, grammar, geography, physiology, and United States history are taught, or to attend upon equivalent instruction by a competent teacher elsewhere than school, for at least 24 consecutive school weeks in each school year, commencing with the first week of school after the first day of September, unless the board of school directors shall determine upon a later date, which date shall not be later than the first Monday in December; but the board of school directors in any city of the first or second class may require attendance for the entire time the schools are in session in any school year." Code Supplement, 1913, Section 2823-a.

Can anyone doubt the established and settled policy of the state to compel the education of all children within its borders between the ages of 7 and 16 years? But some citizen may say that he does not care to have his child educated in the prescribed branches, or attend school at all. The power of the state to enforce such a statute against the wish of the citizen has been challenged, but, so far as we are advised, without success.

So we have the fixed policy of the state that all children between the ages of 7 and 16 must attend either a public or private school, for a specified time, and study specified branches. As early as the Code of 1897, Section 2749, it was provided that, in the public schools, the electors might determine that additional branches should be taught, but that "instruction in all branches except foreign languages shall be in English." Here

again was a declaration of the policy of the state that has long stood unchallenged.

Again, the thirty-eighth general assembly passed an act providing that:

"All public and private schools located within the state of Iowa shall be required to teach the subject of American citizenship." Chapter 406, Acts of the Thirty-eighth General Assembly.

Here we have a clear pronouncement of the policy of the state in regard to all schools, either public or private. Did the legislature have power to enact such a statute? Can the state not only compel children to attend school, either public or private, but also designate the branches that must be taught, and that these shall include the subject of American citizenship? Can some teacher of a private school claim immunity from prosecution for violation of this statute because of the claim that his constitutional rights are invaded, and that the state has no power to compel him to teach American citizenship in a private school? We are referring to these statutes merely to show the established and settled policy of the state.

With this situation before it, the thirty-eighth general assembly enacted the statute in question, providing that, in private as well as public schools, all secular subjects shall be taught in English, below the eighth grade. Was this consistent with the established policy of the state? It applied the established policy of the use of English to private, as well as public, schools below the eighth grade, and, in effect, prohibited the teaching of any secular subject in any other language to pupils of the designated class. It is apparent at once that this legislation is consistent with the long-existent policy of this state, in providing for the education of its youth, in making that education compulsory, in providing what branches of learning must be taught, and finally, in requiring that, for pupils below the eighth grade, all such instruction in both public and private schools shall be in the English language. The policy of the state has been a progressive one, but it has been consistent and in full keeping with its powers to do all these things for the better training and education of its youth for the full duties and responsibilities of American citizenship. The advent of the great World War revealed

a situation which must have appealed very strongly to the legislature as justifying the enactment of this statute. Men called to the colors were found to be, in some instances, not sufficiently familiar with the English language to understand military commands or to read military orders. It was to meet this situation, to encourage the more complete assimilation of all foreigners into our American life, to expedite the full Americanization of all our citizens, that the legislature deemed this statute for the best interests of the state.

The manifest design of this language statute is to supplement the compulsory education law by requiring that the branches enumerated to be taught shall be taught in the English language, and in no other. The evident purpose is that no other language shall be taught in any school, public or private, during the tender years of youth,—that is, below the eighth grade,— to the end (1) that pupils in our schools, public or private, shall be educated in the language of this country, so as to be able to read, write, and spell the same; (2) that time ordinarily devoted to such object be not diverted to others; (3) that pupils be impressed in their youth that English is the language of this country, without a rival, even though another be spoken at home; and (4) that an education such as is given in the common schools be extended to pupils in private schools; and that the standard of education shall be uniform throughout the state. The policy of the state is apparent, and the evil sought to be remedied is manifest.

With the wisdom of the act of the legislature in passing the statute in question, as a means of meeting this situation and seeking to remedy the same, we have no concern whatever. That question was wholly for the determination of the general assembly. They adopted such means as to them seemed wise, appropriate, and efficient. Our sole inquiry is, Did the legislature, in enacting this statute, contravene constitutional provisions? From an early day, it has been the rule of this court that a law will be declared to be unconstitutional only when it is "clearly, plainly, and palpably so." The case must be "clear, decisive, and unavoidable." The court "performs the duty with scrupulous regard for the prerogatives of the co-ordinate branches of

2. Constitutional Law: prohibition of foreign language instruction.

the government, and without lust of power.'' See *Morrison v. Springer*, 15 Iowa 304; *Santo v. State*, 2 Iowa 165; *Stewart v. Board of Supervisors*, 30 Iowa 1, 14; *McGuire v. Chicago, B. & Q. R. Co.*, 131 Iowa 340; *Hubbell v. Higgins*, 148 Iowa 36; *State v. Fairmont Cr. Co.*, 153 Iowa 702; *Hunter v. Colfax Cons. Coal Co.*, 175 Iowa 245.

With these well-established rules in mind, let us inquire, Does the statute in question so infringe upon the Constitution that we must declare it to be invalid?

It is the contention of the appellant that it is inimical to Article 1 of the Constitution of Iowa. This provides:

''Section 1. All men are, by nature, free and equal, and have certain inalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety and happiness.

''Sec. 3. The general assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; nor shall any person be compelled to attend any place of worship, pay tithes, taxes, or other rates, for building or repairing places of worship, or the maintenance of any minister or ministry.''

Appellant's argument is to the effect that the parents of the children attending defendant's school desire that their children shall be taught to read the German language at school, in order that they may read the catechism and Bible in German at home, and receive instruction in religious subjects at home in the language spoken by the parents. The point is stressed that the particular thing taught was *reading;* that to learn to read the German language is ''cultural;'' that to teach reading in German is an ''innocent act;'' and that it is being done by appellant for a *religious* purpose, namely, that the children may, by reason thereof, receive religious instruction at home in the German language.

We cannot accept appellant's conclusion in this matter. It is admitted in the stipulation that the textbook used was of a *secular* character, rather than of a religious character. The ultimate purpose sought to be attained by defendant is not a controlling factor in determining the validity of this statute.

At the outset, let it be noticed that the statute in no manner whatsoever interferes with the defendant's right to impart *religious* instruction in any language he may choose, in the parochial school. It is expressly limited to the teaching of *secular* subjects. He may teach his pupils to read the catechism in German in his school, if he desires, as religious instruction, without violating the law; but he may not teach the *secular* subjects of reading, writing, spelling, grammar, etc., in any foreign tongue. In this there is no interference whatever with appellant's "free exercise" of religion. He may not teach *writing* in German, and evade the effect of the statute by claiming that he did so because his pupils must learn to write on *religious* themes in a language which their parents could read. He admits that he is teaching a secular subject in direct violation of the statute.

The statute in no manner whatsoever interferes with religious freedom. It is expressly limited to secular subjects. There is scarcely any secular subject taught in our schools that cannot fairly be said to be used in some way in connection with religious instruction or religious belief. It would be going to extreme lengths to say that the regulation of the teaching of such a subject was an interference with religious freedom because it *might* be utilized in acquiring religious instruction in some way. Arithmetic, history, writing, geography, all are properly used in religious instruction, to some degree. As bearing on this feature of the discussion, see *Owens v. State,* 6 Okla. Cr. 110 (116 Pac. 345); *Smith v. People,* 51 Colo. 270 (117 Pac. 612); *Reynolds v. United States,* 98 U. S. 145.

Again, it is argued that the act in question is unconstitutional because it violates the Fourteenth Amendment to the Federal Constitution. This amendment has been the subject of such frequent discussion by our courts, Federal and state, that the decisions are like the sands of the sea for number.

Is any right vouchsafed to the appellant by this amendment violated by this statute? There is, as we view it, no inherent right, no "privilege," to teach German to children of tender years that cannot lawfully be denied by the legislature when, in its judgment and discretion, the exercise of such right under existing conditions is inimical to the best interests of the state. This constitutional protection is enjoyed always subject

to the police power of the state to regulate professions, trades, and occupations in the interest of the public welfare. The statutes regulating the practice of medicine, dentistry, and law are familiar examples of such lawful exercise of the power of the state regarding professions. See *Reetz v. Michigan,* 188 U. S. 505; *State v. Bair,* 112 Iowa 466; *Gundling v. Chicago,* 177 U. S. 183; *Hunter v. Colfax Cons. Coal Co.,* supra; 12 Corpus Juris 1122.

As we have observed, a known evil existed, and it was within the power of the legislature to seek to remedy it by the enactment of this statute. The defendant has a right to engage in the profession of teaching, but in so doing he is subject to such legislative enactments as may fairly and reasonably be said to be for the public welfare. We think this statute was a proper and reasonable exercise of the police power of the state, in attempting to prevent an existing evil which the legislature regarded as inimical to the public welfare. Such being the case, the defendant has not been denied any privileges guaranteed him by the Constitution.

Again, it is argued that the act in question is class legislation. We do not so regard it. It operates upon all amenable to it alike. All persons similarly situated are affected alike by it. It applies equally to every teacher of the state, in public, parochial, or private school, teaching pupils below the eighth grade. We have recognized the well-established rule that classification "must be natural and reasonable, and not arbitrary or capricious. The legislation must extend to and embrace accurately all persons who are or may be in like circumstances." *State v. Fairmont Cr. Co.,* supra. For the purpose of ascertaining whether or not the classification is arbitrary and unreasonable, we must take into consideration matters of common knowledge and common report and the history of the times. *Chicago, B. & Q. R. Co. v. McGuire,* 219 U. S. 549; *State v. Fairmont Cr. Co.,* supra. We have already referred to the conditions that existed and the evil the legislature sought to remedy. As before stated, the act applies uniformly to all teachers of the state below the eighth grade. We do not think such classification either arbitrary or unreasonable.

It is argued by appellant that the statute is unreasonable

in prohibiting the teaching of a foreign language below the eighth grade, while permitting it to be taught to those more advanced. We must again look to the purpose of this enactment. The legislature might well have felt that it was of vast importance that those of tender years should have, at that early period, instilled in their minds the lessons to be taught only through the use of the English language; that, if foreign languages are to be taught for "cultural effect," it shall be only after the child has been "rooted and grounded" in the recognized language of our country. The harmful effects of non-American ideas, inculcated through the teaching of foreign languages, might, in the judgment of the legislature, be avoided by limiting teaching below the eighth grade to the medium of English. We do not regard the statute as making an arbitrary or unreasonable classification, or as in any manner violating these constitutional provisions. Statutes of like effect have been enacted in Nebraska, Kansas, Maine, Washington, Arkansas, Indiana, New Hampshire, Wisconsin, and perhaps other states. So far as we are advised, none of such statutes have been held to be unconstitutional. In *Nebraska Dist. of Evan. Luth. Synod v. McKelvie*, 175 N. W. 531, the Supreme Court of Nebraska sustained the constitutionality of the statute of that state, which is almost identical with the statute under consideration.

We hold this statute to be constitutional, and a proper exercise of the police power of the state. It follows that the conviction of the defendant upon the stipulated facts was warranted, and the judgment of the lower court is, therefore,—*Affirmed*.

STEVENS, ARTHUR, and DE GRAFF, JJ., concur.

EVANS, C. J., WEAVER and PRESTON, JJ., dissent.

EVANS, C. J. (dissenting). I. I am constrained to disagree with the majority opinion. The construction of our statute adopted therein is a very severe one. Under elementary rules, a criminal statute which creates an offense that is *malum prohibitum* should be construed strictly, in the sense that nothing shall be added to it by mere implication. The statutory prohibition under consideration here is contained in Section 1,

Chapter 198, Acts of the Thirty-eighth General Assembly, and is as follows:

"Section 1. That the medium of instruction in all secular subjects taught in all of the schools, public and private, within the state of Iowa, shall be the English language, and the use of any language other than English in secular subjects in said schools is hereby prohibited."

The precise question presented in this case is whether the teaching of reading a foreign language in a private, religious school, for the purpose of enabling a child to worship in a common language with its parents and to take religious instruction therein, such as the reading of the catechism, etc., is a violation of this statute. As stated in the majority opinion, the evidence in this case was all contained in a written stipulation. It appears therefrom that the defendant was a teacher in a parochial school, belonging to a church or religious denomination, and that it was his duty, as such, to give instruction in secular subjects, and also in the tenets of the church, so as to prepare the children for confirmation in the church, according to its belief and practice, which confirmation was usually attained at·about the age of 13. All secular subjects taught in such school were so taught in the medium of the English language, as required by the statute. Religious instruction was given in a foreign language: namely, the language of the parents of the children. The prosecution is based upon the general proposition that the teaching of "reading" of any language is the teaching of a *secular* subject. This is the implication which broadens this statute beyond the terms of any prohibition contained therein. I cannot assent to it. "Reading," as a study, is simply a means of acquiring a language. It is language study. Reading, as an acquisition, as a thing learned, is a means of study of all subjects of every nature, whether they be called secular or religious. The majority opinion properly concedes that this prohibition does not restrict the right of parents, at home or through instructors in a private or parochial school, to *worship* according to their faith and religious belief, in whatever language they choose. This concession is clearly necessary, to save the constitutionality of the statute. Section 3, Article 1, of the Constitution of Iowa provides:

"The general assembly shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

Obedient thereto, the peace officer has never invaded the sanctuary of any religious denomination in Iowa. It goes without saying that the free exercise of religion is impossible without the free use therein of such language as the worshipper may choose. Ordinarily, that language is his native language, or at least the language with which he is most familiar. There is no pretense in this statute at interference with that right. Ability to speak and to read a language is essential to intelligent worship. Concededly, the parents had a right to worship in their own language. Necessarily, the children had a constitutional right to worship in the same language. Is the study of the language of worship to be deemed necessarily a *secular* subject? Is "reading" as a study or "reading" as an acquisition, where it is resorted to for the purposes of intelligent worship, to be deemed necessarily a secular subject, or may it also be deemed a religious subject?

By the terms of the written stipulation herein, the study or teaching of reading of the foreign language was only for the purpose of worship and religious instruction. We must not depart from that stipulation of facts. The one provision of the stipulation upon which the prosecution builds its argument is that the textbooks used in the study of "reading" were the ordinary textbooks used in all schools for that purpose, and that the *subjects of the reading lessons* were secular subjects. It is argued, therefore, that this fact made the study a secular subject. This implies that the student of the language is to be deemed to be studying the variety of subjects which appear in the reading lessons of the textbook. The implication thus indulged in is one which arises entirely outside of the statute under consideration. In my judgment, it is not a sound implication, as a matter of fact. Lessons for the teaching of "reading" must have subjects, in order to mean anything. These lessons are not selected for the *subjects* they contain, but for the adaptability of the words and sentences contained therein to the stage of progress of the learner in the study of the language. I think, therefore, that the subjects of the lessons of the text-

book used in the study of "reading" do not fix the character or the purpose of the study. I think it clear, also, that "reading," as a study and as a necessary part of religious instruction, is not to be deemed a secular subject, within the meaning of the prohibition of this statute.

We are committed to the proposition that the motive or purpose of a given conduct is to be considered, in determining whether it be secular or religious. *State v. Amana Society*, 132 Iowa 304. The defendant in the cited case was an incorporated body. Its membership consisted of a religious community. Their religious beliefs were carried into their practical, everyday life. They held all property in common; all members engaged in service; they owned lands and factories and merchandise and live stock into values of hundreds of thousands of dollars. The question involved in the suit against them was whether they were engaged in secular pursuits. We held that they were not, and that all their activities of everyday life, such as would ordinarily be deemed and would be, in fact, secular, were, nevertheless, the exercise of their religious beliefs, and that these activities were their response to their sense of religious daily duty. In another division hereof, I shall incorporate excerpts from the opinion in this case, as well as from other opinions.

Having held, in the cited case, that the operation by the Amana Society of its factories, mills, stores, and farms, all apparently done by the ordinary methods of business, was not a secular business, because its dominant motive was religious, how shall we now say that the study of "reading" for the stipulated purpose of religious instruction and worship is secular, and not religious? To so hold is, in my judgment, to trench upon the constitutional provision which I have above quoted. The courts of this country in all jurisdictions have quite uniformly construed all penal statutes so as to exclude their operation from the religious domain, and so as to protect the absolute freedom guaranteed by the Constitution of religious belief and exercise. If there is any exception to this rule, it has arisen only in relation to extraordinary practices which disturb the public order or shock the sense of fundamental Christian morality; such, for instance, as polygamy. In the case of *Church of the Holy Trinity v. United States*, 143 U. S. 457 (36 L. Ed.

226), an analogous question was before the Supreme Court of the United States, wherein that court construed a Federal statute which prohibited any person from paying the transportation or in any way assisting the importation or migration of any alien into the United States under contract or agreement, express or implied, to perform labor or service of any kind in the United States. Trinity Church had entered into contract with a rector in England that he should come to New York and serve its parish there. Such action on the part of Trinity Church was within the literal terms of the prohibiting act. The Supreme Court, however, construed the act as not applying to the case, notwithstanding its all-inclusive terms, because to so construe it would be an interference with the religious freedom guaranteed by the Constitution, and because such an act was inherently innocent, and was, therefore, beyond the reach of a penal statute. For convenience of reference, excerpts from this opinion will be set out later.

An act similar to ours was enacted in Nebraska, and was construed by the Supreme Court of that state. It was construed as not prohibiting the teaching or studying of foreign languages for religious purposes, even though its language was broad enough to include such prohibition. *Nebraska Dist. of Ev. Luth. Synod v. McKelvie,* (Neb.) 175 N. W. 531. The argument of the court in that case was that the affirmative purpose of the legislation was to require the teaching of the English language and to make it the medium of secular instruction; and that, so long as such dominant purpose was carried out in the particular school, the additional study of foreign languages for religious purposes should not be deemed prohibited. It was also held that such prohibition would be an interference with religious freedom.

Instead of pursuing further mere argument of mine upon the question, I set forth in the following division excerpts from the cited cases, which, to my mind, constitute a quite sufficient argument. Let it be borne in mind that, in the instant case, the defendant met every affirmative requirement of the statute, and taught a full course of secular subjects suitable to the grades, and used the English language as the medium of all such teaching; and this includes the subject of "reading" in English.

When we reflect that the secular and the religious blend in every normal human life, in that the secular serves religion, and religion, if it be true, influences the secular, it must be true that the zone of division is a broad and indefinite one, and that a sharp and definite line of demarcation cannot be drawn. I only contend that the study of language, including its "reading," *may* be religious, even though it be true that it may also be secular. If such study may be religious, then, under the stipulation of facts in this case, it *was pursued for religious purposes.* Even in the absence of such definite stipulation, I would think that the mere rule of strict construction of penal statutes would require us to adopt the more innocent construction.

II.   In the case of. *State v. Amana Society,* 132 Iowa 304, the contention of the State was that this society, being organized solely as a religious society, was unlawfully and in violation of its charter rights engaged in business and manufacturing pursuits for financial gain. Quoting from the opinion (page 314):

"Theoretically, the distinctions pointed out may be correct. Practically, religion may not be so completely separated from the affairs of this life. Theology, the science of religion— that is, of formulating our thinking with respect to religion— has steadily insisted upon connecting religion with the life men lead and the things they do in this world. The great religious struggles of the past have come, in most cases, from the undertaking of men to impose on other men, not their religion, but their science of religion; and against this, rather than religion, as defined by the attorney general, the law has interposed its shield of protection. When theologians formulate their conclusion that anything, such as a particular mode of life, is essential to the attainment of the promised benefits of a religion, it is not for the courts, by resorting to the definitions of lexicographers, to perform the ungracious, if not Herculean, task of determining whether this is so. The anticipated advantages of nearly every religion or creed are made dependent on the life its followers live, and the criticisms most often heard are that the exalted doctrines of righteousness professed are too frequently forgotten in the ordinary pursuits of life, and that the contests for wealth are waged with the rapacity of beasts of prey. Surely, a scheme of life designed to obviate such results,

and, by removing temptations and all the allurements of ambition and avarice, to nurture the virtues of unselfishness, patience, love, and service, ought not to be denounced as not pertaining to religion, when its devotees regard it as an essential tenet of their religious faith. In ascertaining whether various properties of the society are for religious purposes, these should be viewed somewhat from the standpoint of its members. From that viewpoint, its different enterprises are clearly within the rule stated by the attorney general, that this' must 'be convenient and appropriate to religious work and ceremonies and to the worship of God according to their belief;' for it is indispensable to their religious faith that they own their property in common and live a communal life. As a religious principle, they have agreed to this, and to devote their common labor to their common support. None can be said to derive any pecuniary benefit therefrom, in the sense in which that expression is used in the statute. No dividends are declared, and no money is given to any member, save to meet the bare necessities of the most economical existence. * * * On these considerations, we reach the conclusion that the defendant society has not exceeded its powers as a religious corporation. Secular pursuits, such as those conducted by it, are not ordinarily to be regarded as incidental to the powers of a religious corporation, for the very good reason that, ordinarily, they bear no necessary relation to the creed it is organized to promote. But, where the ownership of property and the management of business enterprises in connection therewith are in pursuance of and in conformity with an essential article of religious faith, these cannot be held, in the absence of any evidence of injurious results, to be in excess of the powers conferred by the law upon corporations. We have discovered no decision touching the question decided; but, in view of the spirit of tolerance and liberality which has pervaded our institutions from the earliest times, we have not hesitated in giving the statute an interpretation such as is warranted by its language, and which shall avoid the persecution of any, and protect all in the free exercise of religious faith, regardless of what that faith may be. Under the blessings of free government, every citizen should be permitted to pursue that mode of life which is dictated by his own conscience; and

if this also be exacted by an essential dogma or doctrine of his
religion, a corporation organized to enable him to meet the re-
quirement of his faith is a religious corporation, and as such
may own property and carry on enterprises appropriate to the
object of its creation.''

In the *Trinity Church* case, the Supreme Court of the
United States said (p. 228):

''All laws should receive a sensible construction. General
terms should be so limited in their application as not to lead to
injustice, oppression, or an absurd consequence. It will always,
therefore, be presumed that the legislature intended exceptions
to its language which would avoid results of this character. The
reason of the law in such cases should prevail over its letter.
*   *   *   (p. 230) But beyond all of these matters, no purpose
of action against religion can be imputed to any legislation,
state, or nation, because this is a religious people. *   *   *
(p. 231) Religion, morality, and knowledge, being necessary to
good government, the preservation of liberty, and the happiness
of mankind, schools, and the means of education, shall forever
be encouraged in this state. *   *   * There is no dissonance
in these declarations. There is a universal language pervading
them all, having one meaning; they affirm and reaffirm that this
is a religious nation. These are not individual sayings, declara-
tions of private persons; they are organic utterances; they
speak the voice of the entire people. While, because of a general
recognition of this truth, the question has seldom been presented
to the courts, yet we find that in *Updegraph v. Com.*, 11 Serg. &
R. 394, 400, it was decided that 'Christianity, general Chris-
tianity, is, and always has been, a part of the common law of
Pennsylvania; *   *   * not Christianity with an established
church, and tithes, and spiritual courts; but Christianity with
liberty of conscience to all men.' *   *   * The construction in-
voked cannot be accepted as correct. It is a case where there
was presented a definite evil, in view of which the legislature
used general terms, with the purpose of reaching all phases of
that evil, and thereafter, unexpectedly, it is developed that the
general language thus employed is broad enough to reach cases
and acts which the whole history and life of the country affirm
could not have been intentionally legislated against. It is the

duty of the courts, under those circumstances, to say that, however broad the language of the statute may be, the act, although within the letter, is not within the intention of the legislature, and therefore cannot be within the statute.''

In the cited case of *Nebraska Dist. of Ev. Luth. Synod v. McKelvie*, 175 N. W. 531, the Supreme Court of Nebraska said:

''The operation of the selective draft law (Act May 18, 1917, C. 15, 40 Stat. 76 [U. S. Comp. St. 1918, Sections 2044a-2044k]) disclosed a condition in the body politic which theretofore had been appreciated to some extent, but the evil consequences of which had not been fully comprehended. It is a matter of general public information, of which the court is entitled to take judicial knowledge, that it was disclosed that thousands of men born in this country of foreign-language-speaking parents, and educated in schools taught in a foreign language, were unable to read, write, or speak the language of their country, or understand words of command given in English. It was also demonstrated that there were local foci of alien enemy sentiment, and that, where such instances occurred, the education given by private or parochial schools in that community was usually found to be that which had been given mainly in a foreign language. The purpose of the new legislation was to remedy this very apparent need, and, by amendment to the school laws, make it compulsory that every child in the state should receive its fundamental and primary education in the English language. *** That the same character of education should be had by all children, whether of foreign-born parents, or of native citizens. The ultimate object and end of the state in thus assuming control of the education of its pupils is the upbuilding of an intelligent American citizenship, familiar with the principles and ideals upon which this government was founded, to imbue the alien child with the tradition of our past, to give him the knowledge of the lives of Washington, Franklin, Adams, Lincoln, and other men who lived in accordance with such ideals, and to teach him love for his country, and hatred of dictatorship, whether by autocrats, by the proletariate, or by any man or class of men. * * * The state should control the education of its citizens far enough to see that it is given in the language of their country, and to insure that they understand the nature

of the government under which they live, and are competent to take part in it.  Further than this, education should be left to the fullest freedom of the individual. * * * If a child has attended either the public or private school for the required time, it could not have been the intention of the legislature to bar its parents, either in person or through the medium of tutors or teachers employed, from teaching other studies as their wisdom might dictate.  There can be no question of the cultural effect of the knowledge of a foreign language. * * * If the law means that parents can teach foreign language, or private tutors employed by men of means may do so, but that poorer men may not employ teachers to give such instruction in a class or school, it would be an invasion of personal liberty, discriminative, and void, there being no reasonable basis of classification; but if such instruction can be given in addition to the regular course, and not so as to interfere with it, then equality and uniformity results, and no one can complain.''

III.   I do not discuss the question of constitutionality, because the majority opinion, in effect, concedes that, if the statute is an interference with religious liberty, it would be unconstitutional.  There is no room for difference, therefore, between us at that point.  I think that the *construction* put by the majority upon the statute is an interference with religious liberty.  The majority hold otherwise, and that represents the point of difference between us, so far as the question of constitutionality is concerned.  I would reverse.

WEAVER and PRESTON, JJ., join in this dissent.