STATE ex rel CHAMBERLAIN, State's Attorney, Respondent,
v. HUTTERISCHE BRUDER GEMEINDE et al, Appellants.

(191 N. W. 635.)

(File Nos. 4693, 4746.   Opinion filed December 30, 1922.)

1.   Religious Unincorporated Societies—Public Policy—Corporations
     —Communistic Religious Corporation Held Not in Contraven-
     tion of Public Policy.

     A communistic religious unincorporated society, organized to
     promote and carry on the Christian religion according to its
     tenents, submissive to civil authority, held not to contravene
     good morals or public policy.

2.   Army and Navy—Selective Draft—Corporations—Conscientious
     Objectors—Members of Religious Corporation Held Noncom-
     batants Within Act of Congress.

     Members of a corporation, organized by a communistic re-
     ligious sect for promotion of their religion, teaching submission
     to ordinary civil government and payment of taxes, but oppos-
     ing physical or financial aid to war were within the exemption
     in Selective Draft Act Cong. May 18, 1917, Sec. 4, as amended
     by Act Aug. 31, 1918, Sec. 2, (U. S. Comp. St. 1918, U. S.
     Comp. St. Ann. Supp. 1919, Sec. 2044d), recognizing con-
     scientious objectors as noncombatants, and exempting them
     from active military service.

3.   Religious Societies—Constitutional Law—Corporations—Legisla-
     ture May Govern the Creation and Powers of Legislative Cor-
     porations, Except as Such Powers Are Limited by the Consti-
     tution.

     Const. art. 6, Sec. 3, and article 17, Sec. 7, prohibiting a
     corporation from holding more land than necessary for its busi-
     ness, and inferentially forbidding religious corporations inimical
     to public welfare, leaves the Legislature otherwise free to gov-
     ern the creation and regulation of religious corporations and to
     place proper restrictions thereon, including the limitation of
     acquisition and ownership of real estate, and the question as to
     whether a particular corporation is allowable is one of legisla-
     tive intent.

4.   Religious Societies—Constitutional Law — Corporations — Taxa-
     tion — Forfeiture —Quo Warranto —Communistic Corporation
     Amassing Vast Property Held Not Permissible as Religious
     Corporation.

     In view of Const. art. 11, Secs. 2, 6, 7, relating to corpora-
     tions and exempting from taxation property used exclusively
     for religious purposes, the legislative intent as to such corpor-
     ations generally, and Laws 1919, c. 106, declaring all property
     of a religious society exempt, held that a communistic corpora-

tion engaged in farming and other industrial pursuits, to which, and to the regulation of the conduct of its members its governmental activities chiefly related, comparatively little of its income being devoted to religious or educational work, but conserved so that it accumulated a vast fortune in lands and personal property, was not organizable as a religious corporation, and, having been so chartered, a judgment refusing annulment of the charter, was erroneous.

5.  Religious Societies—Corporations—Forfeitures—Laches—Waiver —State Not Barred by Laches From Annulling Charter of Religious Corporation Acting Beyond Its Corporate Power and Contrary to Policy of Laws.

Where a religious corporation was acting beyond its corporate powers and contrary to policy of the laws in pursuing secular activities and amassing wealth not devoted to religious or educational purposes, the state was not barred by laches in proceeding to annul its charter.

6.  Limitation of Actions — Corporations — Forfeitures — Laches — Waiver—State Not Barred by General Statute From Proceeding to Annul Corporate Charter.

A general statute of limitations did not bar the state from proceeding to annul the charter of a religious corporation for exceeding its corporate powers, such proceeding not being expressly included in the statute.

Smith, J., dissenting in part.

Appeal from Circuit Court, Beadle County; HON. ALVA E. TAYLOR, Judge.

Action in the nature of quo warranto by the State on the relation of A. A. Chamberlain, State's Attorney for Beadle County, against Hutterische Bruder Gemeinde, a religious corporation, and others, to forfeit the named defendant's corporate rights. On judgment adverse to defendant corporation, it appeals, and from portions of the judgment permitting defendant to continue as a corporation on disposing of its property in excess of its authorized stock, relator files cross-appeal. Judgment modified to order dissolution of corporation.

*N. J. Cramer,* of Yankton, and *Crawford & Crawford,* of Huron, for Appellants.

*A. K. Gardner,* of Huron, for Respondent.

Appellants cited: On constitutional guaranty of religious freedom: Const. U. S., Art. VI, and First Amendment; Const. S. D., Art. VI, Sec. 3; Reynolds v. United States, 1 Otto 423, 25

L. Ed. 580; Davis v. Beason, U. S. Sup. Rep., Vol. 10, 300; Civ. Code S. D., Secs. 408, 753, 754, 755, 757, 758, 760, 761, 762; that covenants of members are not against public policy nor good morals: Order of St. Benedict v. Albert Stanhauser, 34 U. S. Sup. Ct. Rep. 932; Goesele v. Bimeler, 14 How. 589; Schwartz v. Duss, 23 U. S. Sup. Ct. Rep. 4; Schriber v. Rapp, 30 Am. Dec. 327; Burt v. Oneida Community, 33 N. E. 307; Speidel v. Henrici, 7 U. S. Sup. Ct. Rep. 610; Gosely v. Separatist Society, 13 Ohio State 144; Waite v. Merrill (Me.), 16 Am. Dec. 238; Gass v. Willhite, 26 Am. Dec. 446; State v. Amana Society (Ia.), 109 N. W. 894; Santa Clara Female Academy v. Sullivan (Ill.), 6 N. E. 183; that judgment impairs obligation of contract and deprives defendant of property without due process: Finley v. Brent (Va.), 12 S. E. 228; In re McGraw's Estate (N. Y.), 19 N. E. 233, 248; Cornell University v. Fisk, 10 Sup. Ct. Rep. 775; Bear v. Heasly (Mich.), 57 N. W. 280; Fair et al v. First M. E. Church (N. J.), 42 Atl. 166; State v. Immanuel Presb. Church (La.), 27 So. Rep. 806; In re South Meeting House, 13 Allen 497; Davis v. Bradford (Shaker Community), 58 N. H. 476; Immanuels Gemeinde (Kan.), 43 Pac. 249; that civil courts will not reverse decisions of church tribunals in controversies over moral conduct and infractions of discipline by members: 34 Cyc. 115-6, 1119-1126, 1133, 1170, 1185, 1187, 1167; Hardin v. Baptist Church (Mich.), 6 N. W. 311; Watson v. Jones, 13 Wall. 674; Gaff v. Green, 88 Ind. 122; M. E. Church v. Harris (Conn.) 47 Atl. 166; O'Donivan v. Chatard (Ind.), 49 Am. Rep. 462; Connitt v. New Prospect Church, 54 N. Y. 551; Wehner v. Fokenga (Neb.), 78 N. W. 28; Fussell v. Hail (Ill.), 74 N. E. 42; Grosvenor v. United Society of Believers, 118 Mass. 78; that statute limiting value of real estate to $50,000 is unconstitutional: 8 Cyc. 729, 731, 774, 776; State v. Hallock (Nev.), 33 Am. Rep. 559; People v. Alberson, 44 N. Y., 50 Pac. 919; People v. Potter, 47 N. Y. 375; Coolse Const. Lim. (6th Ed.), 75; Page v. Allen (Pa.), 98 Am. Dec. 272; 36 Cyc. 1122, 1132, 1156; State v. Moores (Neb.), 76 N. W. 175; Holy Trinity Church v. United States, 12 Sup. Ct. Rep. 510; Terrett v. Taylor et al, 9 Cranch 43; Wolff v. New Orleans, 103 U. S. 358; Railway Co. v. Pennington County, 20 S. D. 270, 22 S. D. 205; Rathbone v. Worth (N. Y.), 45 N. E. 15; Rison v. Fall (Ark.), 88 Am. Dec. 52;

People v. May, 3 Mich. 598; People v. Newell, 7 N. Y. 79, 97; 2 Bouv. 126; Broom Leg. Max., 651, 655; U. S. v. Fisher, 2 ich. 137; U. S. v. Fisher, 2 Cranch. 358; Fletcher v. Peck, 6 Cranch. 136; Dart. College v. Woodward, 4 Wheat. 518; Ayers v. Knox, 7 Mass. 306; Henry v. Tilson, 17 Vt. 479; Rathbone v. Wirth, 40 N. Y. Supp. 535; Sec. 122, Act Cong. Approved Mar. 3, 1887; Sec. 540, Art. 14, Civ. Code 1877; Sec. 3136, Comp. Laws, 1887; Sec. 755, Civ. Code 1903; Ledegear v. Bochkoven (Ok.), 185 Pac. 1098; that corporation has not engaged in business not expressly authorized by charter: In re Hanson's Estate (S. D.), 159 N. W. 399; 36 Cyc. 1132, 1156; Townsend v. State (Ind.), 47 N. E. 10; Farmer v. Luzerne (Pa.), 31 Atl. 682; Coverdale v. Edwards (Ind.), 58 N. E. 495; that state by long silence has waived right to ask forfeiture: 10 Cyc. 1088; 32 Cyc. 1431, 1279; People v. Manhattan Co., 9 Wend. 380; People ex rel Howard v. Schnepp (Ill.), 53 N. E. 632; People ex rel Misner v. Hanker (Ill.), 64 N. E. 253; Soule v. People (Ill)., 23 N. E. 344; People ex rel Maloney (Ill.), 51 N. E. 664; Cook, Stock and Stockholders, Sec. 632; People v. Ottawa, etc., Co., 115 Ill. 281; In re Mechanic's Society, 31 La. Ann. 627; State v. Morris (Tex.), 11 S. W. 392; People v. Williamsburgh, etc., Co., 47 N. Y. 586; People v. Oakland, etc., Book 1, Doug. (Mich.) 282; Briggs v. Cape Cod, etc., Co., 137 Mass. 71; that members have right to collective ownership: Burt v. Oneida Community (N. Y.), 33 N. E. 307; Society of Sharkers v. Watson, 69 Fed. 730; that property is not held in perpetuity by the corporation: Thornberg v. Higgins (Ind.), 22 L. R. A. 42; Carver v. Smith, 46 Am. Rep. 210; Jones v. Chandler, 40 Ind. 591; Chandler v. Cheney, 37 Ind. 391; Barren Creek Ditching Co. v. Beck, 99 Ind. 250; Arnold v. Arnold, 30 Ind. 305; Johnston v. Johnston (Mo.), 61 L. R. A. 166; So. Dak. Civ. Code, Secs. 2692, 2693, 2695; Hiles v. Fisher (N. Y.), 30 L. R. A. 305; Fulper v. Fulper (N. J.), 32 L. R. A. 701; Simons v. Bollinger (Ind.), 48 L. R. A. 324; In re Pairy (Pa.), 49 L. R. A. 444.

Respondent cited: That the exercise of franchise, claimed to have been granted defendant corporation by the state, is not in keeping with public policy: State v. Lumber Co., 24 S. D. 136; Hale v. Henkel, 201 U. S. 43; McQuire v. C. B. & Q. Ry. (Ia.), 108 N. W. 911; Luther Hospital Assn. v. Baker (S. D.),

167 N. W. 148; that practices of defendant corporation are not within constitutional guaranty of religious freedom: Reynolds v. U. S., 98 U. S. 145; Davis v. Beason, 133 U. S. 333; S. D. Const., Sec. 3, Art. VI; Glover v. Board of Education, 14 S. D. 139; Striech v. Board of Education, 34 S. D. 169; that defendant has violated its charter by holding more real estate than necessary or proper for its legitimate business: S. D. Const., Art. XVIII, Sec. 7; State ex rel v. Union Investment Co., 7 S. D. 51; Civ. Code 1903, Sec. 75; Sec. 755, 1903 Civ. Code; Blackstone, Book 2, Ch. 18, p. 267-272, Cooley's Third Edition; First M. E. Church v. Dixon (Ill.), 53 N. E. 887; Carroll v. City St. Louis, 67 Ill. 568; that state had not waived its right to forfeit defendant's charter: People v. Phoenix Bank (N. Y.), 37 Am. Dec. 634; People v. Kingston, 23 Wend. (N. Y.) 193; State ex rel Denu v. Rapid City Library Assn., 32 S. D. 248; Sec. 571, Code of Civ. Procedure; Mader v. Plano Mfg. Co., 17 S. D. 553; that court on cross-appeal should order forfeiture of charter: In re First Church of Christ (Pa.), 97 A. S. R. 753; People v. Pullman Co. (Ill.), 51 N. E. 664; People v. Stanford (Cal.), 18 Pac. 85; State v. Lumber Co., 24 S. D. 164; Wright v. Lee, 4 S. D. 246; S. D. Rev. Code 1919, Sec. 2782; State v. Swelgin, 254 Fed. 884.

PER CURIAM. The relator, Chamberlain, as state's attorney of Beadle county, upon the request of the State Council of Defense, a voluntary organization created during the late war, upon leave from the circuit court of the Ninth judicial circuit, brings this action in the nature of quo warranto, against the Hutterische Bruder Gemeinde, a corporation purporting to have been organized for the purpose of promoting, engaging in, and carrying on the Christian religion, Christian worship, and religious teachings and education, according to the religious belief of its members, and having its principal place of business in Bon Homme county.

The complaint alleges that said corporation is in fact engaged in agricultural pursuits in the counties of Bon Homme, Hutchinson, Hanson, and Beadle in this state; that the alleged purposes of said corporate organization were fraudulent and false, and that said corporation was in fact organized for the purpose of business and profit, and has at all times continuously carried on and transacted the business of farming, stock-raising, and manufac-

13—Vol. 46, S. D.

turing, and other pursuits for pecuniary profit only, and has thereby amassed a vast fortune, no part of which is devoted to religious purposes, nor to the worship of God according to any religious belief; that said corporation has willfully and in violation of of its charter failed, neglected, and refused to pursue the purposes for which it purports to have been incorporated; that the defendants Waldner, Glanzer, David Hofer, and David C. Hofer are managing officers of said corporation, who are charged with the duties of enforcing the rules and regulations of said corporation, and claim the right to enforce the same in defiance of the Constitution and laws of the state of South Dakota and the laws of the United States; that said corporation and its officers exercise a baneful influence over the members thereof, and, under the guise of religion, maintain and enforce rules and regulations in violation of the laws of South Dakota, and require its members to obey rules and regulations of said corporation, even though the same violate and contravene the laws of the state and of the United States, and enforce such rules and regulations to the extent of punishing and expelling members of said corporation for obeying the law of the land, where the law contravenes the rules and regulations aforesaid; that the defendant corporation willfully fails and refuses to contribute in any way toward the defense of the United States now at war with Germany and Austria-Hungary, and fails and refuses to pay taxes for the support of the government of the United States in its present war; that the existence of such corporation is a menace to society and to the government of the state of South Dakota and of the United States; that to permit said corporation to continue its corporate existence in its business is and will be contrary to public policy and good morals; wherefore plaintiff demands judgment that said defendant be adjudged to have forfeited its corporate rights, privileges, and franchises, and that its charter be annulled and vacated and the corporation dissolved, and, upon the rendition of such judgment, the corporation, its officers, and agents, be enjoined from exercising any corporate rights; that a receiver be appointed of its property with the usual powers; that its property be sold and converted into money; that its affairs be wound up and its property be applied to the payment of its debts and liabilities, together with the costs of this action; that such further or other judgment be rendered as may be just and equitable.

The defendants, by their answer, admit the existence of the incorporation alleged, but deny that it was fraudulently organized, and deny that it has failed, neglected, and refused to pursue the purposes declared in its charter, and expressly deny other allegations of the complaint. The answer also affirmatively alleged that the Hutterische Society, composed of men and women associated for the purpose of promoting, engaging in, conducting, and carrying on the Christian religion, Christian worship, education, and teaching according to their religious belief, came from Germany to the United States about 1874, and from that time, as such society, have held and used all property and things in common according to the word of God revealed to them; that as a part of their religion they believe in farming and cultivation of the land and soil, and the raising of crops, stock, and other things thereon, from which they may derive their support and living as the fruits of their labor; allege that all property is held by the corporation in trust for the common benefit of the members of said society and that, by the contract and agreement of its members, none may be withdrawn by any member, but that any member who may withdraw, or be expelled from said society, upon returning and being received as a member, becomes entitled to all the benefits and rights of other members; that about the year 1905, the members of said society determined to form a corporation pursuant to the Constitution and laws of the state of South Dakota and pursuant to the same purposes said corporation was formed as stated in its charter; that after such incorporation, all the property, real and personal, of said society was transferred and conveyed to said corporation, to be used and controlled by it for the common use and benefit of all its members, and all of said property has ever since been owned, used, and controlled by said corporation for the purpose declared in its charter, and no other purpose whatever; that said society became incorporated and adopted by-laws by the written assent of all its members, which by-laws were entered in a book of by-laws kept by the corporation; that since said incorporation the members thereof have continued the practice of their religion, religious teachings, worship, and education as before, and have carried on and conducted farming and stockraising for the use, consumption, and support of the families of said members, and have sold and disposed of grain and stock and other produce not necessary for their use and con-

sumption, using the proceeds thereof to obtain necessaries of life, and for machinery, implements, and other incidental expenses, and the buying of other lands necessary for the purposes aforesaid, and have not used any of said lands or property for any purpose other than the prosecution of their religious teaching and worship, in accordance with their religious belief, and that all of the income therefrom has been devoted to religious purposes according to their religious belief, and that the members of said corporation have devoted all their time, work, labor, and services, and earnings to said corporation, freely and voluntarily, for the uses and purposes expressed in its articles of incorporation.

_ The trial court made findings of fact and conclusions of law adverse to defendants, and to the effect that the corporation has violated its charter by misuser, in that it has engaged in business other than that expressly or impliedly authorized by its charter, and has exercised franchises and rights not granted thereby; has engaged in secular pursuits and business, and has acquired and owns real estate in excess of that necessary and proper for its legitimate business, exceeding in value $50,000, and of a value exceeding $1,000,000; that the property of said corporation has not been and is not devoted to the purposes for which its charter was granted, to-wit: Christian worship and religious education and teachings, but has been devoted to secular pursuits in violation of its charter and the statutes of the state of South Dakota and the Constitution of this state; and entered judgment perpetually enjoining said corporation and its officers from engaging in secular pursuits including the business of farming, stockraising, milling, etc.; requiring the corporation to dispose of its real estate not necessary for its legitimate purposes, which in no event may exceed the sum of $50,000, and requiring said defendants to comply with said judgment and decree within 90 days and file a report showing such compliance, and how it has disposed of its property, and what part thereof it has retained as within the value of $50,000; that the by-laws of the corporation be amended to exclude all provisions with reference to secular business, and that defendants submit such amendment to the court for its approval within 90 days; and if defendants fail to so comply and file said report and make said amendments to its by-laws, that a receiver be appointed to take charge of its property, who shall select and

set aside property not exceeding $50,000, and shall dispose of the remainder of said property at public sale upon 30 days' notice, and shall thereafter make report of his acts to the court for approval.

The defendants have instituted the main appeal. The plaintiff has taken a cross-appeal from those portions of the decree which permit the defendant to continue as a corporation upon disposing of its property in excess of $50,000. Except as otherwise noted, we refer to plaintiff in using the word respondent and to defendants when we use the word appellants.

The articles of incorporation declare that:

"The purposes for which this corporation is formed are to promote, engage in and carry on the Christian religion, Christian worship, and religious education and teachings, and to worship God according to our religious beliefs."

But such purposes are further clarified by the following declaration in the preamble to such articles:

"We, the undersigned, residents of the state of South Dakota, associated together for religious purposes, and by the name of Hutterische Bruder Gemeinde, have and do associate ourselves together as a body corporate, pursuant to the Constitution and laws of the state of South Dakota for the purpose of promoting, engaging in and carrying on the Christian religion, Christian worship, and religious education and teachings according to our religious belief that all members should act together as one being and have, hold, use possess and enjoy all things in common, and engage in, carry on and conduct farming and agriculture and cultivation of the soil, and manufacture of flour and other articles from agricultural products, we all being of one mind, heart and soul, according to the word of God revealed to us and therefore we do hereby adopt the following articles of incorporation."

The articles further provide that the corporation shall be perpetual; that its principal place of business shall be Hutterische, Bon Homme county, South Dakota; that the corporate powers and the privileges, business, and property thereof shall be exercised, transacted, conducted, and controlled by a board of 13 trustees, who shall be members of said corporation, provide for officers of said corporation, and declares that all property, real and personal, of the corporation shall be devoted to the common

use, interest, and benefit of all the members thereof, for the purposes of said corporation, so long as they remain members thereof, and that all such property shall be subject to taxation as provided by the Constitution and statutes of this state.

At the trial the following admissions' and statements of fact material to the case were made in open court and entered upon the record, namely:

"That, at the time of executing and filing the aforesaid articles of incorporation and receiving said corporate certificate, the said incorporators, 202 in number, were members of a religious sect, commonly known as Mennonites. That the particular sect to which said incorporators belonged was, and is, a voluntary, unincorporated, religious society known as Hutterische Bruder Gemeinde, whose members had for many years lived, and were then living, in communities, who owned and operated all property in common as community property, and who were, or claimed to be, conscientiously and religiously opposed to all war. That said voluntary, religious society had existed continuously, as a church, since 1874, in the county of Bon Homme and other counties, and still exists. That all its members became and are members of said corporation, which has no members except such as are members of said church. That the members of said church, as fundamental doctrines of their faith, profess to believe that they are commanded to live and act together in communistic life with one mind, heart, and soul, and that the Scriptures command them to have, hold, use, possess, and enjoy all things in common; that they must never, intentionally, under any circumstances, kill a fellow human being, nor take an oath, nor hold political office, nor bring suit; that each member must devote all his time and service to the communistic society, without compensation or reward, other than support, maintenance, education, and religious instruction of himself and members of his family; that all must cultivate the soil to supply the common needs of all, and as an acceptable service of God. That no person can become a member of the corporation who is not a member of the church, and no person can become a member of the church without publicly confessing his belief in, and agreeing to, its articles of faith, receiving the rite of baptism, and subjecting himself to its rules and discipline. That the members of said church profess to rec-

ognize and follow the teachings of the Bible, as interpreted by their own intelligence and in the light of certain religious books handed down by their forefathers. That they firmly adhere to the aforesaid religious doctrines to the extent of withholding all voluntary aid to the government under which they live in prosecuting any war, on the alleged ground that their duty to God is higher, in a moral sense, than their obligation to any human government. That a violation by a member of this doctrine of nonresistance is cause for his expulsion from the church. That, as a condition of membership, each member, at the time of signing the rolls of the church, agrees to the surrender and renunciation of the right to own and hold property as an individual. That sick, helpless, and infirm members, or their dependents, are cared for out of the community fund. That the members of the said church and of said corporation, and the dependent members of their families who now live a communistic life and depend entirely upon the community property controlled by said corporation for their support, maintenance, education, and religious instruction, number 856. That said community property consists of farm lands in the colonies of Milltown and Old Bon Homme in Bon Homme county, South Dakota, and live stock and farm machinery located thereon, and farm lands in the province of Manitoba, Dominion of Canada, and personal property thereon, all of the estimated value of $1,112,000. That said property has always been taxed for state, county, school, and local purposes, which tax has been paid without question by the defendant, which is also required to pay, and does pay, an income tax to the federal government. That defendant refused to voluntarily subscribe for what are known as Liberty Bonds in aid of the war, or to any war aids. That, since its incorporation as aforesaid in 1905, the defendant and its members have continued to use the community property in common as members of the voluntary religious society had used it from the year 1874, when they came to the United States from South Russia. That its members have no individual property and no means of support, other than the right to receive support and maintenance out of the community fund, while members of the community, in common with all other members. That, in connection with the raising of crops and live stock upon lands held for the common use and support of its members

and their dependent families, the defendant also operates mills, blacksmith shops, and harness shops to supply the needs of such members and their families; but not for general trade. That upon the incorporation of the defendant in 1905, all the lands and other property owned in common by the members of the voluntary society was transferred, so far as the legal title is concerned, to defendant. That neither the defendant nor its members, since it was incorporated, have used, operated, or accumulated any property except community property for the collective use, ownership, enjoyment, and support of all the members of said religious society in common. That the increase in the value of the common property has been produced by the industry of the members and their simple mode of life in community, and the increase in the value of land and farm products in recent years. That the annual income above what is used for the support and maintenance for the members and their dependent families, is placed in the common fund. That the legal title to all the community property of the voluntary communistic society was transferred to the defendant, after it became a corporation; and the defendant, through its board of trustees and executive officers, directs and manages all the agricultural and business enterprises carried on by the members. That it owns no property and carries on no business other than the property and business held and operated in common ownership by the members."

In addition to the foregoing facts, the trial court found, in substance, that the lands held and owned by the corporation were mostly in a high state of cultivation; that the buildings and improvements thereon are permanent in character and of great value; that blacksmith shops and other industrial improvements were located thereon; that no considerable expenditures have been made for the building or maintenance of churches, hospitals, schools, or educational institutions; that the members of said corporation mingle with the outside world only so far as necessary to the transaction of business; that certain officers of the corporation and church administer punishment and discipline for alleged acts of misconduct of its members, where such misconduct constitutes either a violation of law, or of the rules and regulations of the corporation; that the members of the corporation, in conformity to its rules and by-laws, have refused to take any part in

the defense of the United States in its war with Germany and Austria-Hungary, either by taking up arms, paying war taxes, buying government securities, or contributing to Red Cross or other war agencies or activities; that their religious books are printed in the German language; that members are instructed in the English language in their public schools, and that the German langauge is generally spoken in the colonies by the members thereof; that the children are restrained within the colonies and prevented from mingling with the outside world; have not been permitted to attend the State Fair, and have been deprived of such enlightenment as may be acquired by mingling with the outside world and attending institutions maintained by the state; that parents are deprived of the exclusive custody, discipline, and control of their children; that the defendants, in living a communistic life and following the pursuits of farming, stock-raising, and other secular pursuits believe they are engaged in carrying on the Christian religion; that no stock is provided for in the corporate charter, and no profits, dividends or property of any kind have ever been distributed to the members of the corporation; that all profits arising from the pursuits followed by its members are held by the corporation, except such as have been necessarily expended in carrying on the affairs of the corporation and for maintenance of members and their families in the simple mode of life required by their religious rules and regulations.

These are substantially all the facts upon which the court based its conclusions of law and its judgment. It would be interesting, but is not necessary, to quote at length from the writings introduced in evidence of the religious teachers who founded this religious society. These writings show the attitude of its members toward all governments under which they live, and toward war; the payment of taxes, and of war exactions. We may, however, quote briefly therefrom:

"We must submit to such governments so far as they do not interfere with matters of conscience or command us to act against God himself. "Submit yourself to every ordinance of man for the Lord's sake.' 1 Peter, 2:15. 'Whether it is by the King or unto Governors.' Verses 14 and 15. 'Put them in mind to be subject to principalities and powers, to obey magistrates, to be ready in every good work.' 'Therefore it is right to obey and be

submissive to them and the more diligent we are in this the more we will be beloved by God.' Romans, 13:2. But when human government commands us to act against God we must leave that command undone. Apostles, 5:29. 'We ought to obey God rather than man' for conscience is free and belongs to God only. He shall govern, teach and lead in that sphere as it pleases Him. Therefore when government undertakes to invade conscience and to control in matters of faith, it usurps the power of God and we are not bound to obey in such matters as these. Now as the functions of government is God's order and ordinance, it is, in its legitimate sphere, right and good, but whenever it transcends this sphere the misuse is unjust. Yet the office of government is necessary, even though it be abused. 'For rulers are not a terror to good works but to the evil.' Romans, 13:23. Therefore we must honor the office of government even though it happen that the impious hold places in it because that fact does not remove or take away the necessity for such government. Even though the ruler is not a good man, we must not conclude that the government must be dissolved; we must not attempt to overthrow it because an impious man is ruler."

Again:

"Because Christ, as the Prince of Peace, established a kingdom, which is the church, all worldly warring is to cease. * * * Nations shall not lift the sword against nation, neither shall they learn war any more."

Again:

"Because human government is ordained and commanded by God, so taxes to support it are ordered and commanded. * * * Therefore we, as his followers, diligently obey his command and do not oppose taxes of the government as such. But, for war—killing and shedding blood—where the tax is especially asked for that purpose, we do not willingly give anything; not because we are disloyal, but because we fear God and believe we are violating His command, and we do not dare to thus become guilty of the sins of others in acts of murder. Some may say, if we must pay tribute to whom tribute is due it is unjust for us to refuse to pay such a tax. But we answer that we do not refuse to pay tribute to whom tribute is due, for God has commanded us to do that—the yearly income for the maintenance of the government; but it

does not follow that we should willingly pay tax to support the commission of a crime by the government, as we regard war to be."

These people, upon what they believe to be sufficient Biblical authority, have adopted community life; they believe that renunciation of individual property, community ownership, and contributions of labor and services to the common fund, are necessary to the existetnce of their religious organization and their spiritual welfare, and that the accumulation of property for the support of all its members in the manner commanded by the New Testament, is a part of their religious duty. The record shows that up to 1918, when the value of farm products was greatly enhanced by war prices, the total income of the corporation was but slightly in excess of what was necessary to support the 856 persons dependent on that income, and to meet necessary expenditures in carrying on the affairs of the corporation.

A religious corporation, as such, cannot engage in religious worship, observances, or practices. It is created for no other purpose than to provide for the temporal and secular needs of a spiritual organization commonly known as the church. Secular acts and transactions of such a corporation are incident and subordinate to the religious purposes of the church, and so long as they are directed primarily to that purpose, such corporation retains legal character as a religious corporation. It is conceded that the affairs of the corporation, its religious teachings and practices, its community organization and life, and its various secular occupations have been carried on since its incorporation in 1905, in the same manner as were the affairs of the original unincorporated society, from its advent into the territory of Dakota in 1874. It is shown that the membership of the church and corporation are grouped in colonies of varying numbers, located in Bon Homme, Hutchinson, Hanson, and Beadle counties, each colony operating and controlling its own secular and religious affairs, having its own church, its own ministers, and its immediate head men or officers, who control its local affairs, under the general control of the religious corporation. The members of the corporation mingle with the outside world only so far as necessary to the transaction of business, and each must be a member of the Hutterische Church to be eligible as a member of the cor-

poration. The conduct of the members of the church and corporation is regulated by the by-laws and rules of the corporation which are those of the church, and all members are subject to the officers and representatives of the church and corporation, who administer punishment and discipline for acts which may be violations of law and are also violations of such rules and regulations. But misconduct, whether constituting violations of law or of religious rules and regulations, is not reported to officers of the law for prosecution or punishment.

Joseph Waldner, a minister of one of the colonies, and one of the trustees of the corporation, called as an adverse witness by the state, testified that the members of the church and corporation do not believe in war under any circumstances; that they would refuse compliance with any law which required them to support the government in war; that they pay all taxes except those levied for war purposes; that it is a violation of their rules to put on a military uniform or take up arms or to do any act in support of war, even to peeling potatoes in an army kitchen; but they believe civil government is put in by the Lord, and government is right, and they obey it as far as their conscience permits; that they obey the law as closely as they possibly can, and compare it with the New Testament to see whether they are allowed to do that or not; that in each colony there are three men who have charge of all its affairs, the minister, the house boss and the farm boss; that their religious and business operations are closely allied and the two operate together; that they believe in and practice community ownership of property as one of the fundamental doctrines on which the church is founded, and believe it is taught in the Bible; that religious services are held in each colony every Sunday and also daily religious services, at which the members assemble together. Each colony has its church and schoolhouse; every teacher, including those who are members of the colony, is required to have a certificate from the county superintendent, and schools are carried on in the colonies from 9 in the morning to 4 in the afternoon, wherein are taught the same studies from the same books used in all the public schools of the county; that the school books used are in English; that after school the pupils are taught German, and are given religious instruction; that members of the church or corporation do not interfere with

punishment by the civil authorities for violation of law; that the board which punishes members for violation of religious regulations do not undertake to act in place of the courts or juries of the state; that such boards do not assume to usurp the power of the state and punish men for breaking the laws of the state; that they assume to deal with members only for acts which are violations of the rules of the church, and that any member is free to leave the church if he desires, to escape punishment for breaking the rules; that members receive food, clothing, medical services, everything they need, out of the common fund; that all are on a plane of absolute equality; that the minister receives no more than the carpenter or common laborer; that the common fund is built up to furnish food, raiment, and necessities for all the members of all the colonies, old and new; that their religious convictions and rules do not require any member to do any act hostile to government; that they have not and do not voluntarily consent to investing the common fund in Liberty Bonds, or for war purposes, but do not and have not made actual resistance to the taking of their property for such purposes, and do not even protest against it, any more than they do against payment of ordinary taxes, and that they have submitted to the taking of property to the extent of some $37,000 for Liberty Bonds, the Red Cross, and the State Council of Defense.

The foregoing extended statement of the pleadings defining the issues tried, and of the facts disclosed by the record and the findings and judgment of the trial court, seem to be necessary to an understanding of our views as to the rights of the parties.

So far as the record discloses, the actual or purported refusal of members of the corporation and church, to obey law, either state or national, consists solely in a refusal to aid physically or financially in the carrying on of war. They are not shown to have engaged in any unlawful or immoral pursuits or occupations. It is not shown that they have ever harmed the state, society, or any human being, unless we assume that they harm themselves, their children, and the state by following the mode of living adopted by them, and which they believe to be in accordance with the teachings of the New Testament. They are not opposed to civil government, though claiming religious liberty. Section 3, art. 6, of the state Constitution declares that:

"The right to worship God according to the dictates of conscience shall never be infringed. No person shall be denied any civil or political right, privilege or position on account of his religious opinions; but the liberty of conscience hereby secured shall not be so construed as to excuse licentiousness, the invasion of the rights of others, or justify practices inconsistent with the peace or safety of the state."

Article 6 of the Constitution of the United States declares that:

"No religious test shall ever be required as a qualification to any office or public trust under the United States."

And the First Amendment thereto declares that:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."

A complete and illuminating discussion of these provisions of the federal Constitution is found in Davis v. Beason, 133 U. S. 333, 10 Sup. Ct. 299, 33 L. ed. 637, wherein Justice Field said:

"It was never intended or supposed that the amendment could be invoked as a protection against legislation for the punishment of acts inimical to the peace, good order and morals of society. With man's relation to his Maker, and the obligations he may think they impose, and the manner in which an expression shall be made by him of his belief on those subjects, no interference can be permitted, provided always the laws of society designed to secure its peace and prosperity, and the morals of its people, are not interfered with."

[1] And many times it has been held by federal and state courts that religious associations and corporations similar to the Hutterische Bruder Gemeinde corporation are not inimical to, or in contravention of, public policy nor good morals. Order of St. Benedict v. Albert Steinhauser, 234 U. S. 640, 34 Sup. Ct. 932, 58 L. ed. 1512, 52 L. R. A. (N. S.) 459, Ann. Cas. 1917A, 463; Goesele v. Bimeler, 14 How. 589, 14 L. ed. 554; Schwartz v. Duss, 187 U. S. 8, 23 Sup. Ct. 4, 47 L. ed. 53; Schriber v. Rapp, 5 Watts (Pa.) 351, 30 Am. Dec. 327; Burt·v. Oneida Comm., 137 N. Y. 346, 33 N. E. 307, 19 L. R. A. 297; Speidel v. Henrici, 120 U. S. 377, 7 Sup. Ct. 610, 30 L. ed. 718; Gasely v. Separatists' Society, 13 Ohio St. 144; Waite v. Merrill, 4 Greenl. (Me.) 102, 16 Am. Dec. 238; Gass v. Wilhite, 2 Dana (Ky.)

170, 26 Am. Dec. 446; Santa Clare Female Society v. Sullivan, 116 Ill. 375, 6 N. E. 183, 56 Am. Rep. 776; State v. Amana Society, 132 Iowa 304, 109 N. W. 894, 18 L. R. A. (N. S.) 909, 11 Ann. Cas. 231.   In Waite v. Merrill, supra, the court said:

"We must remember that in this land of liberty, civil and religious, conscience is subject to no human law; its rights are not to be invaded or even questioned, so long as its dictates are obeyed, consistently with the harmony, good order and peace of the community.   With us, modes of faith and worship must always be numerous and variant; and it is not the province of either branch of the government to control or restrain them, when they appear sincere and harmless."

[2]   The Congress of the United States, recognizing the constitutional rights of persons to adhere to conscientious convictions, as noncombatants in time of war, enacted section 4, c. 15, Act May 18, 1917, and section 2, c. 166, Act Aug. 31, 1918 (U. S. Comp. St. 1918, U. S. Comp. St. Ann. Supp. 1919, § 2044d), with a proviso exempting such persons from the provisions of the selective draft, declaring that:

"Nothing in this act contained shall be construed to require or compel any person to serve in any of the forces herein provided for who is found to be a member of any well-recognized religious sect or organization at present organized and existing, and whose existing creed or principles forbid its members to participate in war in any form and whose religious convictions are against war or participation therein, in accordance with the creed or principles of said religious organizations, but no person so exempted shall be exempted from service in any capacity that the president shall declare to be noncombatant."

And the Supreme Court of the United States held such exemptions to be constitutional.   Arver v. United States, 245 U. S. 366, 38 Sup. Ct. 159, 62 L. ed. 349, L. R. A. 1918C, 361, Ann. Cas. 1918B, 856.

The members of the defendant corporation and church society are clearly within this exemption from military services and their refusal to engage in war activities or to make voluntary contributions thereto, does not constitute a violation of any federal or state law.   It is universally held that religious organizations, corporate or otherwise, whose beliefs and practices do not

lead to licentiousness, the invasion of the rights of others, or to practices inconsistent with the peace, safety, or moral welfare of the state, are not against public policy.

[3]    Section 7, art. 17, of the state Constitution declares that:

"No corporation shall engage in any business other than that expressly authorized in its charter, nor shall it take or hold any real estate except such as may be necessary and proper for its legitimate business."

The primary effect of the constitutional provision quoted, is to inhibit legislative action attempting to create religious corporations authorized to hold or acquire real estate not necessary and proper for its legitimate business as a religious corporation. Clearly it does not otherwise limit the legislative power as to the creation, organization, and functioning of religious corporations. The Constitution does not declare that the Legislature shall create religious corporations endowed with specified powers, including the right to hold real estate. Affirmative declarations as to the rights or powers of corporations created by legislative authority are found in section 11, Id., relating to telegraph companies, and in section 16, Id., relating to railroad corporations, which declare that such corporations "shall have" certain specified "rights."

. Section 1, art. 17, provides only that the Legislature shall provide by general laws, for the organization of all corporations hereafter to be created, and the right (section 9, Id.) to—

"alter, revise or annul any charter of any corporation now existing and revocable at the taking effect of this Constitution, or any that may be created, whenever in their opinion it may be injurious to the citizens of this state, in such a manner, however, that no injustice shall be done to the incorporators."

Other provisions of article 17 require the Legislature to enact specified regulatory provisions governing such corporations. But the only constitutional provision relating to religious corporations is that quoted above, which forbids the granting of charters to such corporations which would authorize them to own or acquire real estate in excess of that necessary and proper for legitimate religious purposes. The Constitution does not declare, affirmatively, that religious corporations shall be given the right to acquire real property "necessary and proper" for religious purposes.

The Legislature is therefore left free to enact regulations governing the creation, powers and functioning of religious corporations, with two exceptions, inhibitive in their nature, viz., forbidding charters authorizing ownership by religious corporations of real estate, in excess of that necessary for legitimate purposes, and that contained in section 3, art. 17, which inferentially forbids the chartering of religious corporations in aid of alleged religious practices or doctrines inimical to good morals, the rights of others, or to the peace or safety of the state.

In 7 R. C. L. 29, § 7, it is said:

"It is well established that no corporation can exist without the consent or grant of the sovereign. The power to create corporations is one of the attributes of sovereignty, and the Legislatures of the several states, unless restricted by constitutional provisions, have plenary power to do so."

It necessarily follows that the Legislature had plenary power and authority to place such restrictions upon the creation and powers of religious corporations as it might deem proper and necessary in the public interest, among which is included a limitation upon the acquisition and ownership of real property within the state. It would serve no useful purpose to attempt a historical review of legislation limiting the powers of religious corporations to acquire and hold real property, except to observe that such limitations are found in many of the states of the union. The right of voluntary associations of persons to acquire and hold real estate to be devoted to religious uses and purposes is not involved in this case.

[4] Many propositions are argued in the briefs, but there is one fundamental question which, if answered in the negative, disposes of all of those propositions, aside from the question of waiver by the state hereinafter referred to, and that question is this: Was the defendant properly chartered as a religious corporation? To our minds the answer must be found by determining what was the legislative intent. All that we have heretofore said about freedom of religious worship may be true, and is true, and yet the defendant may not be entitled to be incorporated as a religious corporation unless the Legislature so intended. The leading opinion in support of the legality of this corporation is State v. Amana Society, 132 Iowa 304, 109 N. W. 894, 18 L. R.

14—Vol. 46, S. D.

A. (N. S.) 909, 11 Ann. Cas. 231. In that opinion Judge Ladd said:

"Had these people formed themselves into a voluntary association, unincorported, and, as such, acquired the property involved in this case and operated the various enterprises, there could have been no objection. Neither the common law nor any statute of this state prohibited such a course. Such an association and its trusteeship of property for its members in common has been held in numerous decisions to be in harmony with public policy. Schriber v. Rapp, 5 Watts (Pa.) 351, 30 Am. Dec. 327; Gass v. Wilhite, 2 Dana (Ky.) 170, 26 Am. Dec. 446; Waite v. Merrill, 4 Greenl. (Me.) 102, 16 Am. Dec. 238; Goesele v. Bimeler, 14 How. (U. S.) 590, 14 L. ed. 554; Schwartz v. Duss, 187 U. S. 8, 23 Sup. Ct. 4, 47 L. ed. 53; Ellis v. Newbrough, 6 N. M. 181, 27 Pac. 490. See Burt v. Oneida Community, 137 N. Y. 346, 33 N. E. 307, 19 L. R. A. 297."

With the above we unhesitatingly agree. Even if this corporation be dissolved, its property may be transferred to trustees and, so far as anything appears in the record, the society may continue to function as an unincorporated society.

But Judge Ladd continues (italics are ours):

"On no tenable ground can doing precisely the same things through a corporation be held opposed to public policy. On these considerations we reach the conclusion that the defendant society has not exceeded its powers as a religious corporation. Secular pursuits, such as those conducted by it, are not ordinarily to be regarded as incidental to the powers of a religious corporation, for the very good reason that ordinarily they bear no unnecessary relation to the creed it is organized to promote. But, where the *ownership of property and the management of business enterprises in connection therewith are in pursuance of and in conformity with an essential article of religious faith, these cannot be held, in the absence of any evidence of injurious results, to be in excess of the powers conferred by the law upon corporations.* We have discovered no decision touching the question decided; but, in view of the spirit of tolerance and liberality which has pervaded our institutions from the earliest times, we have not hesitated in giving the statute an interpretation such as is warranted by its language and which shall avoid the prosecution of any and protect

all in the free exercise of religious faith, regardless of what that faith may be. Under the blessings of free government; every citizen should be permitted to pursue that mode of life which is dictated by his own conscience, and if this, also, be exacted by an essential dogma or doctrine of his religion, a corporation organized to enable him to meet the requirement of his faith is a religious corporation and as such may own property and carry on enterprises appropriate to the object of its creation."

We cannot agree that the italicized portion is sound. He admits he has found no precedent for it. It is not a question of tolerance and liberality nor yet a question of avoiding persecution. It is simply and solely a question of legislative intent. As has heretofore been shown, there is no constitutional right of any society to become a religious corporation. The Constitution has only mentioned two inhibitions upon the Legislature beyond which it cannot go if it allows the incorporation of religious societies. Whether the Legislature shall allow any religious society to become a corporation is a matter for it to determine.

It must also be borne in mind, in considering the Amana case that there the question was not whether the corporation was properly organized as a religious corporation. The question there was whether the corporation was one for pecuniary profit or one not for pecuniary profit.

A careful study of the evidence in this case, particularly the evidence touching the financial receipts and disbursements of the organization, compel us to the conclusion that the principal business of the corporation is secular, viz., the engaging in farming and other industrial pursuits for the purpose of the sustenance of its colonies; that next in order the business of the corporation is political, viz., the government of its members; and that lastly and secondarily the objects of the corporation are religious, and, to a very limited degree, educational. For this reason we cannot conclude that it was the legislative intent that this corporation was organizable as a religious corporation.

There is another strong and compelling reason for the like conclusion which is derived from a consideration of the question of taxation. Sections 6 and 7, art. 11, of the Constitution say:

"Sec. 6. The Legislature shall, by general law, exempt from taxation property used exclusively for * * * religious * * * purposes."

"Sec. 7. All laws exempting property from taxation other than that enumerated in sections 5 and 6 of this artitcle, shall be void."

If, as is contended by appellant, all of the land of this corporation within this state (more than 20,000 acres) is used exclusively for religious purposes, then, according to the above constitutional provisions, none of it has ever been subject to taxation. It is no answer to this proposition to say that the corporation has always paid taxes on this real estate. Nor does the provision in the articles of incorporation support the argument against the above proposition. The clause in the articles in regard thereto is this (italics ours) :

"All of said property both real and personal shall be subject to taxation *as provided by the Constitution and statutes of this state."*

Plainly, if this property is used exclusively for religious purposes it is not taxable, even under the above clause in the articles of incorporation. But there is yet another phase of the question of taxation to consider, and that is whether or not all property of a religious corporation is not exempt from taxation, regardless of use. By amended section 2 of article II of the Constitution, adopted in November, 1918, the Legislature—
"is empowered to divide all property including moneys and credits as well as physical property into classes and to determine what class or classes of property shall be subject to taxation and what property, if any, shall not be subject to taxation."

Apparently, pursuant to this amendment, the Legislature declared by chapter 106, Laws 1919, that the following property shall be exempt from taxation:

"1.   *   *   *
"2.   *   *   *

"3. All property belonging to any * * * religious society, or used exclusively for * * * religious purposes."

If subdivision 3 means what it says, and if the above is a constitutional classification (which we do not decide), then all property of a religious corporation is exempt from taxation regardless of its use.

We cannot believe that it was the legislative intent that these thousands of acres of land and the thousands of dollars of per-

sonal property which are devoted to agriculture and other industrial pursuits, should be exempt from taxation. If they should not be exempt, then that is a persuasive reason for holding that the Legislature did not intend the incorporation as a religious corporation of a society such as defendant.

[5] Appellant further contends that the state is barred by laches because of its long acquiescence in the acquisition and ownership of real property by defendant corporation in excess of the value limited. It seems to be conceded that the state in certain classes of cases may be barred from demanding forfeiture of a corporate franchise by long acquiescence in, or legislative recognition of, the continued existence of a corporation. But that doctrine is an exception to the general rule and has no application where the acts complained of are clearly antagonistic to law or to public policy, and beyond the corporate power. In People ex rel Moloney v. Pullman's Palace Car Co., 175 Ill. 125, 51 N. E. 664, 64 L. R. A. 366, it was held that the state was not estopped from questioning the right of a corporation to do certain acts and hold property, which were beyond the scope of its powers, by reason of long acquiescence therein, where such acts were clearly antagonistic to public policy, and beyond the corporate power. The court said:

"It is the general rule that laches, acquiescence, or unreasonable delay * * * on the part of the officers of the state, is not imputable to the state when acting in its character as a sovereign. There are exceptions to this general rule." Such defense is not "available as against the sovereign or state, except in cases where the right and title of a corporation to corporate existence was questioned because of some defect in the original charter, irregularity in the proceedings for the organization of the corporation, or its failure to perform or fulfill some condition precedent to its legal organization. In such cases, if the conduct of the sovereign be such as to constitute an admission of knowledge of the defect or omission and a declaration that forfeiture is not insisted upon, it will be deemed, as in other breaches of conditions, the right to declare the forfeiture for such default, omission or breach has been waived; or, in such cases forfeiture may be denied on the ground of acquiescence arising from long and unreasonable failure of the judicial department to test the legal organization

and existence of the corporation. In the case at bar, the appellee is conceded to be a corporation de jure, and the complaint is it had assumed and exercised, and is assuming and exercising, powers not granted by its charter or implied by law. * * * The usurpations of the corporation are not only those of the past but also those of the present, and its plea admits it contemplates a repetition of the offenses in the future. * * * We do not think the demand of the sovereign that usurpations so clearly antagonistic to good public policy shall be restrained can be defeated by any imputation of laches, or upon the ground that acquiescence is to be inferred from the failure to invoke the aid of courts at an early day!"

[6] Nor will a general statute of limitations preclude the state from maintaining such an action, unless expressly included within the terms of the statute. Eel River R. Co. v. State, 155 Ind. 433, 57 N. E. 388; State v. Pawtuxet Turnpike Co., 8 R. I. 521, 94 Am. Dec. 123. See also, note 8 Am. St. Rep. 199, 14 L. R. A. (N. S.) 339. We therefore conclude that the state has not waived the right to bring this action.

We are persuaded therefore that the trial court should have decreed a vacation of the articles of incorporation and a dissolution of the corporation. Defendants are denied relief upon their appeal. Upon the appeal of plaintiff, the relief just suggested will be granted. As so modified, the judgment and order appealed from will be affirmed, and the cause will be remanded to the trial court, with permission to the corporation to transfer all of its property real and personal to trustees of an unincorporated organization. Costs will be taxed against the defendants.

ANDERSON, J., not sitting.

SMITH, J. (dissenting): I concur fully with my associates in the views expressed in the majority opinion, with the exception of two propositions: First, the rejection of the views of Judge Ladd in State v. Amana Society; and, second, the conclusion drawn as to the legislative intent disclosed by the statutes of this state authorizing the creation of religious corporations.

The Amana case was an action brought by the state of Iowa on the relation of the Attorney General to forfeit the charter of that society on the ground that it was not a religious corporation in fact, but was engaged in agriculture, manufacture, mechanical

and commercial business pursuits as a corporation for profit and had amassed immense wealth in violation of its charter. The members of the society believed that they were commanded to live in communities and own all things in common. Their religious doctrines, ideals, and practices were almost identical with those of the members of the Hutterische Bruder Gemeinde. The Iowa court held that it was not a corporation for profit; that its business operations were merely incidental to the carrying out of the religious purpose for which it was incorporated, and refused to vacate its charter. Judge Ladd discusses at great length the same objections urged against the defendant corporation in this case, and draws conclusions as to the legislative intent directly opposite to those expressed in the majority opinion. I believe his reasoning to be sound and logical and his conclusions correct.

I am convinced upon the facts recited in the majority opinion that the corporation defendant, when organized, was, and ever since has been, a religious corporation within the meaning and intent of the statute, and that it was not organized fraudulently for the primary purpose of carrying on secular business. I am convinced that its business operations have at all times been carried on in conformity with its charter and the religious convictions of its organizers and managers and the membership of the church whose secular affairs it represents. I am convinced that neither the religious convictions of its membership nor its business operations are immoral or harmful to society or the state. I believe these views to be sustained by an overwhelming weight of authority, as shown by the numerous decisions cited but not reviewed in the majority opinion. The legislative intent must be found to be that expressed in the language used in its enactments. The legislative intent, so far as religious incorporations are concerned is expressed in section 8864, 8866, Revised Code. Section 8864:

"All such corporations may hold all the property of the association owned prior to incorporation, as well as that acquired thereafter in any manner, and transact all business relative thereto; but no such corporation shall own or hold more real property than may be reasonably necessary for the business and objects of the society. * * *"

Section 8866:

"Any corporation of the character mentioned in this article

may sell, exchange or mortgage any or all property held or owned by it in the manner determined by such corporation."

In these statutory provisions I can discover no legislative intent to inhibit the formation or existence of a religious corporation of the kind incorporated in this case.   Section 8864, supra, declares that:

"No such corporation shall own or hold more real property than may be reasonably necessary for the business and objects of the association."

The last clause of this section is, in substance, a compliance with section 7, art. 17, of the Constitution, which declares that:

"No corporation shall engage in any business other than that expressly authorized by its charter, nor shall it take or hold any real estate except such as may be necessary and proper for its legitimate business."

If the views of Judge Ladd are correct, as I believe them to be, the defendant corporation cannot be held to have acquired or to own real property not reasonably necessary for the business and objects of the society.

My associates classifly the activities of the defendant corporation under three heads, and state that—

"The principal business of the corporation is secular, viz., engaging in farming and other industrial pursuits for the purpose of the sustenance of its colonies; that next in order, the business of the corporation is political, viz., the government of its members; and that lastly and secondarily, the objects of the corporation are religious and, to a very limited degree, educational."

In my judgment, the facts stated in the record do not warrant such conclusion.   The religious activities, observances, and worship of these people, as shown by the record, are much the same as those of other religious denominations, and nothing in the record casts doubt upon the consistency and sincerity of their conduct.   Public schools are maintained in their communities supported by taxation, conducted by public school teachers, duly authorized and licensed to teach in conformity with the educational laws of the state.   Industry and thrift are a part of their religious convictions and training and their accumulations of property are the result of such training and community and combined effort, directed by men of intelligence and business experience.   I find

in these facts no warrant for saying that "the principal business of the corporation is secular." The successful business operations of these people, I fear, are given undue prominence, without being mindful of the foundation upon which success has been builded.

I think Judge Ladd had a clear and correct conception of both the law and the facts when he said (132 Iowa 304, 109 N. W. 984, 18 L. R. A. (N. S.) 909, 11 Ann. Cas. 231):

"Secular pursuits, such as those conducted by it [the Amana Society] are not ordinarily to be regarded as incidental to the powers of a religious corporation, for the very good reason that ordinarily they bear no necessary relation to the creed it is organized to promote. But, where the ownership of property and the management of business enterprises in connection therewith, are in pursuance of, and in conformity with, an essential article of religious faith, these cannot be held, in the absence of any evidence of injurious results, to be in excess of the powers conferred by the law upon corporations. * * * We have not hesitated in giving the statute an interpretation such as is warranted by its language, and which shall avoid the persecution of any and protect all, in the free exercise of religious faith, regardless of what that faith may be. Under the blessings of free government, every citizen should be permitted to pursue that mode of life which is dictated by his own conscience, and if this, also, be exacted by an essential dogma or doctrine of his religion, a corporation organized to enable him to meet the requirement of his faith is a religious corporation, and as such may own property and carry on enterprises appropriate to the object of its creation."

I do not think we are called upon at this time to consider and decide any question as to exemptions from taxation, as I think the majority opinion does do and must do, before that question can be considered as having any bearing upon legislative intent, in interpreting the statutes relating to the creation of religious corporations.

I cannot do otherwise than dissent from the controlling conclusion reached by my associates.

Note—Reported in 191 N. W. 635. See American Key-Numbered Digest, (1) Religious Societies, Key-No. 4, 1924 Ann. to 34 Cyc. 1116; (2) Army and Navy, Key-No. 20, 5 C. J. Sec. 28; (3) Religious

Societies, Key-No. 4, 34 Cyc. 1116; (4) Religious Societies, Key-No. 4, 34 Cyc. 1151-1152; (5) Religious Societies, Key-No. 35, 1924 Ann. to 34 Cyc. 1118; (6) Limitation of Actions, Key-No. 11(1), 25 Cyc. 1006-1007.

On public policy as related to communistic life or tenure of property see notes 8 L. R. A. (N. S.) 909 and 52 L. R. A. (N. S.) 459.

As to effect of laches upon state's right to oust a corporation of its right and franchise see note 14 L. R. A. (N. S.) 336.

On court decisions under Selective Service Act of May 19, 1917, see note L. R. A. 1918E, 1024.