Iowa County, Appellant, v. Amana Society, Appellee.

No. 41423.

June 24, 1932.

Hatter & Harned and J. M. Dower, for appellee.

E. J. Sullivan and W. E. Wallace and H. B. Claypool, for appellant.

Evans, J.—The Amana Society is a corporation organized, not for profit, under the laws of Iowa. It comprises in its mem-

bership a certain religious sect known as the Community of True Inspiration. It has sought to join the spiritual and the temporal in the same covenant and to subject the temporal to the dominance of the spiritual. To that end its membership have sought to join themselves in mutual service to each other and to hold a community of ownership in all their worldly goods. This membership consists of approximately nine hundred members, all adult (minors not eligible). They came in a body to Iowa County about the year 1858 and settled upon a large tract of land then purchased by them and situated in Iowa County. They established their seven villages and in these villages they have lived a communistic life down to the present time. The Society was legally incorporated in 1859 under the laws of this state. All persons of such religious faith were eligible to membership. A proposed member surrendered to the larger body the possession and control of his property and received a credit therefor, which entitled him to a return of his property, if he later withdrew from the Society. Every member had the right to recede from the Society at will. The trustees of the Society also had power to expel any member. The items involved in this suit began in 1904. They relate to members of the Society who became insane and were confined in the Insane Hospital. The action is predicated primarily upon Section 2297 of the Code of 1897, which was as follows:

"The provisions herein made for the support of the insane at public charge shall not be construed to release the estates of such persons nor their *relatives* from liability for their support; and the auditors of the several counties, subject to the direction of the board of supervisors, are authorized and empowered to collect from the property of such patients, or from any person legally bound for their support, any sums paid by the county in their behalf, as herein provided; and the certificate from the superintendent, and the notice from the auditor of state, stating the sums charged in such cases, shall be presumptive evidence of the correctness of the sums so stated. If the board of supervisors in the case of any insane patient who has been supported at the expense of the county shall deem it a hardship to compel the *relatives* of such patient to bear the burden of his support, or charge the estate therewith, they may relieve such *relatives*

or estate from any part or all of such burden as may seem to them reasonable and just. The estates of insane or idiotic persons who may be treated or confined in any county asylum or poorhouse, and the estates of persons legally bound for their support, shall be liable to the county for the reasonable expense, or so much thereof as may be determined by the board of supervisors."

Section 2297 was preceded by Section 1433 of the Code of 1873, which was as follows:

"The provisions herein made for the support of the insane at public charge, shall not be construed to release the estates of such persons nor their *relatives* from liability for their support; * * * If the board of supervisors * * * shall deem it a hardship to compel the *relatives* of such patient to bear the burden of his support, they may relieve such *relatives* from any part or all of such burden as may seem to them reasonable and just."

Sections 3595 and 3597 of the present Code are as follows:

"3595. Insane persons and persons legally liable for their support shall remain liable for the support of such insane. The County Auditor, subject to the direction of the Board of Supervisors, shall enforce the obligation herein created as to all sums advanced by the county."

"3597. If the Board of Supervisors in the case of any insane patient who has been supported at the expense of the county shall deem it a hardship to compel the *relatives* of such patient to bear the burden of his support, or charge the estate of such patient therewith, they may on application relieve such *relatives* or estate from any part or all of such burden as may seem to them reasonable and just."

The plaintiff predicates its action upon that part of Section 2297 which purports to authorize the Auditor to collect from the property of the insane patients or from "any person *legally bound* for their support."

It is further contended by the plaintiff that the defendant-Amana Society was legally liable for the support of its membership; that such legal liability rested upon its constitution and articles of incorporation; and that such liability was con-

tractual. Prior to its incorporation this religious sect or community had adopted a constitution. Among the provisions of the constitution relied on by the plaintiff are the following:

Article 1 contained the following:

"The purpose of our association as a religious Society is therefore no worldly or selfish one, but the purpose of the love of God in His vocation of grace received by us, to serve Him in the inward and outward bond of union, according to His laws and His requirements in our own consciences, and thus to work out the salvation of our souls, through the redeeming grace of Jesus Christ, in self-denial, in the obedience of our faith and in the demonstration of our faithfulness in the inward and outward service of the Community by the power of Grace, which God presents us with.

"And to fulfill this duty we do hereby covenant and promise collectively and each to the other by the acceptance and signing this present constitution."

Article 2 provided:

"In this bond of union tied by God among ourselves, it is our unanimous will and resolution, that the land purchased here and that may hereafter be purchased, shall be and remain a common estate and property, with all improvements thereupon, all appurtenances thereto, as also with all the labors, cares, troubles, and burdens of which each member shall bear his allotted share with a willing heart."

"Article 3: Agriculture and raising of cattle and other domestic animals in connection with some manufactures and trades shall, under the blessing of God, form the means of sustenance for this Society. Out of the income of the land and the other branches of industry the common expenses of the Society shall be defrayed.

"The surplus, if any, shall from time to time be applied to the improvement of the common estate of the Society, to the building and maintaining of meeting and school houses, printing establishments, to the support and care of the old, sick and infirm members of the Society, to the founding of a business and safety fund, and to benevolent purposes in general."

Article 4 provided for the election of thirteen trustees, upon whom all power of management and discretion was conferred.

"Article 5: Every member of this Society is in duty bound to hand over his or her personal and real property to the trustees for the common fund, at the time of his or her acceptance as a member, and before signing of this constitution.

"For such payments into the common fund each member is entitled to the credit thereof in the books of the Society and to a receipt signed by the director and secretary of the board of trustees, and is moreover secured for such payments by the pledge of the common property of the Society."

"Article 6: Every member of this Society is, besides the free board and dwelling, and the support and care secured to him in his old age, sickness and infirmity, further entitled out of the common fund to an annual sum of maintenance for himself or herself, children and relations in the Society, and these annual allowances shall be fixed by the trustees for each member single or in families, according to justice and equity, and shall be from time to time revised and fixed anew.

"And we the undersigned members of this corporation in consideration of the enjoyment of these blessings in the bond of our Communion, do hereby release, grant and quit-claim to the said Corporation, for ourselves, our children, heirs and administrators, all claims for wages and interest of the capital paid into the common fund, also all claims of any part of the income and profits, and of any share in the estate and property of the Society separate from the whole and common stock."

Article 8 provided that such members as shall recede from the Society shall receive back the money paid into the common fund with interest thereon.

It is the contention of the plaintiff that the provisions of the constitution above indicated imposed upon the Society a legal liability to support its membership for life, and that thereby it came under the classification of the statute liable to the plaintiff-County for reimbursement of the amounts paid for the support of its members in the Insane Hospital. The defenses set up are numerous. We shall confine our consideration in the main to two of them.

Preliminary to such consideration, reference may be ad-

vantageously had by the reader to our opinion in State v. Amana Society, 132 Iowa 304.

II. Assuming for the moment that the corporate-Society was liable contractually, and legally bound to its members to support them during life, did such obligation bring the defendant within the terms of Section 2297 as a person "legally bound?" It will be noted that Section 2297 purported in the first instance to negative any implication that the obligation of the County should operate "to release the estate of such persons nor their *relatives* from liability for their support." The foregoing indicated a conception in the legislative mind of *existing* law. This was that in certain cases relatives might be held to a liability for service to a patient. At common law a father could be held for the support of his minor child; and a husband could likewise be held for the support of his wife. These two illustrations meet what appears to be the legislative conception of vicarious liability. This same legislative conception appears in Section 3597, wherein power is conferred upon the board of supervisors to forgive the liability if it be deemed to work a hardship. The evident purpose of that statute was to give power to release not certain classes of persons so liable, but to release all of them. In conferring power upon the Board to release the estate of the patient and likewise his relatives, there is no suggestion of a reservation of liability as against some nonrelated person. Reading all these statutes together, the interpretation stands out plainly that the only persons within the legislative mind, to be held liable, were such relatives as were liable at common law. The statute did not purport to create or pursue new or other liabilities, which might arise out of contract or out of tort. In our previous consideration of these statutes, we have so interpreted them. In Guthrie County v. Conrad, 133 Iowa 171, we held a father liable at common law for the support and care of his minor son. See also Dawson v. Dawson, 12 Iowa 512. In Wapello County v. Eikelberg, 140 Iowa 736, we held a husband liable for the support of his wife. As against this we have held that a parent is not liable at common law for the maintenance of an adult child. Monroe County v. Teller, 51 Iowa 670. We have also held that a wife is not liable for her husband's support in an insane institution. Blackhawk County v. Scott, 111 Iowa 190. In the latter case the wife

was held exempt from liability notwithstanding her statutory liability for family expenses. See also Delaware County v. McDonald, 46 Iowa 170; Jones County v. Norton, 91 Iowa 680.

In Monroe County v. Teller, 51 Iowa 670, we defined the word "relatives" as used in Section 1433 of the Code of 1873 to have reference only to those relatives who at common law were legally liable for the support.

We have also held that the statutory provisions here under consideration trench so closely upon the limits of legislative power that they should be strictly construed. Delaware County v. McDonald, 46 Iowa 170; Monroe County v. Teller, 51 Iowa 670. In the interpretation of these statutes, we have never gone farther than to sustain the liability of the father for his minor son and of the husband for his wife. We deem it clear that the interpretation of the statute should go no farther than its terms.

In the Monroe County case we said:

"The word 'relatives,' as used in the first clause of the section, and 'relatives,' as used in the last clause, must be construed to mean the persons from whom the county may collect such claims; that is, 'persons legally bound' for the support of the insane person."

III. In our foregoing division we have assumed for the sake of the argument that the defendant was under a contractual liability to support the member for life. We now come to the question: Was there such liability contracted by the defendant?

In this case the plaintiff relies not upon any formal contract entered into by the Society, but upon the statements of the constitution and of the Articles of Incorporation. The constitution purported to represent the mutual understanding and purposes of the membership of the Amana Society before such membership or such Society was incorporated. The incorporation later effected gave a legal entity to the Society. In their pronouncements these individuals did not purport to stipulate for rights of property, or for any temporal acquisition for themselves. They declared for self-denial and self-renunciation; for mutual service and helpfulness to each other. They *bound* themselves in terms to nothing, not even to a continuing membership. In their dealings with each other they assumed the

broad obligation of "justice and equity," regardless of stipulations or of legal right. In the distribution of income they submitted themselves unreservedly to the discretion of thirteen trustees. Their constitution proclaimed their purposes. These indicated the daily use of the joint earnings for their daily sustenance. They indicated a periodical distribution of surplus to the extent of the individual needs of each member. No promise was exacted from any member that his membership should continue. Every member was at liberty to recede at any time and to demand back his original contribution to the common purse. The power of expulsion of any member was conferred unreservedly upon the trustees. In short these members stipulated for no *legal right*. On the contrary the waiver of legal rights was the very essence of their self-abnegation. The fact that in the main each one of these members intended to live throughout his life in this relation, serving his fellows and being served by them, furnishes the only ground for the contention that the Society had obligated itself to support them for life. The corporation, as organized, purported to be "not for pecuniary profit," but, on the contrary, "for benevolent, charitable and religious purposes." The burden is on the plaintiff at this point to show that by some form of contract the parent Society had become legally liable for the support of each of these members. The question at this point is not whether these members intended to live throughout their lives in the mutual service of each other and in obedience to their religious faith; but whether they were under *legal obligation* to do so. Did the Society have any legal power to hold these members together compactly as a body, and was it bound to exercise that power in the interest of the individual member? Suppose that a large number of these members had withdrawn. Did the Society have any legal power to prevent it? Would the remaining members have any grievance against the Society because their own living had been rendered less secure through the withdrawal of other members? Could any member predicate a breach of contract as against the Society by reason of the decimation of the ranks? Before their incorporation this body of people constituted a religious community. When they incorporated themselves for benevolent, religious and charitable purposes they still constituted the same religious community. They asked no legal sanction for any

temporal right. They mutually waived compensation and wages, and with implicit faith in each other, they took daily sustenance from their daily toil. Nothing is disclosed in this record which would enable a member to maintain a suit against the Society for breach of contract. Even if the alleged contract were conceded, yet he could show no breach of it. The fact that the State took the patient into control did not operate as a breach of the Society's contract. The answer to this point, as made by the plaintiff, is that it is not suing upon the contract; that it relies upon the contract only for the purpose of identifying the defendant as coming within the classification of the statute.

The argument of plaintiff is that its action is predicated upon the statute, and not upon the contract; that, therefore, it is not concerned as to whether the contract has been breached or not. But this argument is negatived by the terms of the statute itself. The statute does not purport to create a new cause of action. It simply assumes (1) that a cause of action exists against the estate of the patient, and (2) that a cause of action may exist against some relative "legally bound." On these hypotheses it disclaims any purpose to release any such cause of action or existing obligation. It is therefore incumbent upon the plaintiff to show a pre-existing contractual obligation of the defendant for the costs of the patient at the Insane Hospital. It will not avail the plaintiff to show a contractual obligation of this defendant to do something else or less than this very thing. And here is a vital spot in plaintiff's case. It does not claim to have shown a contractual obligation to pay the hospital expenses of the patient. It claims only that it has shown a contractual obligation on the part of the defendant to *support the member* at the home of the Society. But the plaintiff may not sustain its allegation of the larger obligation by proof of the lesser one. If it sues on the contract it must prove the breach. If it disclaims the necessity of suing upon the contract, then it must rely upon the statute as *creating* a cause of action in its favor. The statute does not so purport. It simply purports to provide a *remedy* for the enforcement of an obligation already existing. The only alternative argument left to the plaintiff at this point is that the statute does to some extent create a cause of action against any person who has contracted to *support the member.*

This is only reading an ingenuity into the statute, which is discoverable only by an ingenious eye. This very argument was considered by this court many years ago in Blackhawk County v. Scott, 111 Iowa 190. In that case the County sued the wife of the patient for his support at the Insane Hospital, on the ground that under the statute the wife was liable for family expenses, and in that sense was liable for the support of the husband as a member of the family. We held that the larger liability claimed could not be tacked onto the lesser one. In holding the wife not liable in that case we necessarily held that a statutory liability for support did not bring the defendant within the hypothesis of Section 2297 of the Code of 1897.

In the two cases wherein we have held the defendant liable, we have predicated the liability upon the common-law *status* of the defendant. In the one we held the father liable for the expense incurred for his minor son (Guthrie County v. Conrad, 133 Iowa 171) ; and in the other we held the husband likewise liable for his wife. The status of the defendant in each case was imposed upon him by common law and not by contract. The status itself was obligatory upon him, and he could not change it, if he would. And it may be added here in support of the first division hereof, that only a *status* was within the legislative mind in the enactment of Section 2297 and its kindred sections; and such was the significance of the repeated use of the word "relatives" in such section.

Inasmuch as the plaintiff disclaims a right of recovery upon the contract, we need not consider its failure to show a breach of the contract. By this disclaimer the plaintiff limits itself to the narrow ground that the statute picks up its half-proved cause at the point where a contract of support is shown and carries it to its consummation. To this we answer that the statute purports only to be remedial, and to apply only to a cause of action already existing. It does not purport to create a new cause of action.

In Jones County v. Norton, 91 Iowa 680, we put the following interpretation upon this statute:

"As already stated, there is no common law liability on the part of the defendant, and it is a familiar rule that none will be held to exist under the statute unless expressly provided. The

only provision for reimbursing the county is * * * Section 1433, which so far as relates to this question, is as follows: 'The, provisions herein made for the support of the insane at public charge shall not be construed to release the estate of such persons from liability for their support; and the auditors of the several counties, subject to the direction of the board of supervisors, are authorized and empowered to collect from the property of such (insane) patients any sums paid by the county in their behalf as 'herein provided.' * * * The first of the section does not create a liability, but simply provides that the provisions made for public support shall not release the estates of such persons from liability for their support. The purpose of this provision is to leave persons who furnished necessary care and support to an insane person, in the absence of care by the county, * * * to their rights under the common law.''

Other defenses are pleaded. In view of our conclusion as indicated in the foregoing, we have no occasion to consider these.

We reach the conclusion that the trial court properly dismissed the case, and its judgment is accordingly affirmed.—Affirmed.

WAGNER, C. J., and STEVENS, FAVILLE, DE GRAFF, ALBERT, and GRIMM, JJ., concur.

KINDIG, J. (specially concurring)—I agree with the conclusion reached by the majority in this case on the theory that there is no contract between the individual insane person and the Amana Society, under which the latter agreed to support the former while confined in the State Insane Hospital.